**HOLLY SPRINGS FUNERAL HOME,
INC., et al., Plaintiffs,**

v.

**UNITED FUNERAL SERVICE, INC.,
et al., Defendants.**

**No. WC 6727–K.**

United States District Court
N. D. Mississippi, W. D.

Aug. 29, 1969.

Wall Doxey, Jr., Holly Springs, Miss., for plaintiffs.

Leon L. Porter, Jr., Semmes Luckett, Clarksdale, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

This is an action for injunctive relief and for treble damages in the amount of $300,000 based upon alleged violations of 15 U.S.C. §§ 1 and 2 (Sherman Act) and 15 U.S.C. § 15 (Clayton Act).[1] Plaintiff, Holly Springs Funeral Home, Inc., of Holly Springs, Mississippi, a firm performing general undertaking services and licensed to sell burial insurance policies,[2] purports to bring this suit as a class action for itself and for all other funeral homes in the State of Mississippi which are not owned, operated or controlled by burial insurance companies.[3] Plaintiff's trade area is confined to Marshall County, Mississippi, and portions of adjoining Benton and Union Counties. We shall attempt to describe the defendants' corporate business organizations as briefly as possible, as follows: United Funeral Service, Inc., of New Albany, Mississippi, a principal defendant herein, was chartered in February 1964, and owns directly two funeral homes, United Funeral Service of New Albany (formerly Smallwood Funeral Home) and McInnis-Porter Funeral Home of Clarksdale, Mississippi, the assets of which were purchased in 1964 and 1965, respectively. The business of both funeral homes is confined to an area of an approximate 50 mile radius from the city in which each is located. United Funeral Association, Inc., (another defendant) was chartered in 1960

---

1. 15 U.S.C. §§ 1, and 2 make illegal "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several states, or with foreign nations * * *," and make liable to criminal punishment [e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations", respectively. 15 U.S.C. § 15 provides that "[a]ny person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States * * * and shall recover threefold the damages by him sustained * * *." Additional basis for this court's jurisdiction is found in 15 U.S.C. § 26.

2. The plaintiff corporation has agency contracts to sell Class "A" and Class "B" burial insurance policies for National Burial Insurance Association of Greenville, Mississippi, and for Mississippi Funeral Association of Amory, Mississippi, respectively. It is also authorized to sell policies for the Protective Life Insurance Company of Brookhaven, Mississippi, which is a domestic industrial life insurance company. Plaintiff is not affiliated, however, with any of these companies, and under its agency contracts, has sold approximately 1,500 Class "A" and Class "B" burial policies. We will later define the terms of such policies.

3. National Funeral Home, Inc., of New Albany, originally a named plaintiff, was, at its request, dismissed as a party by order dated July 18, 1967.

as a legal reserve burial insurance company authorized by state law to write Class "B" policies, and its operations are limited to writing insurance policies sold by its agents in the northern portion of Mississippi. United, Inc., (not named as a defendant) is a holding company organized by United Funeral Service, Inc., with subsidiary company holdings as follows: Southern Undertaking Association, Inc. (a named defendant); Southern Burial Insurance Company (a named defendant); Southern Monument Insurance Company, Newman Funeral Home; Newman Funeral Home-Charleston Branch, and Reynolds Funeral Home.

The only business of Southern Undertaking (chartered in 1960) and Southern Burial (chartered in 1963), both of New Albany, is the writing of Class "A" burial policies in accordance with Mississippi law. Southern Monument, a monument sales concern, is, for all practical purposes, defunct and presents no effective competition to plaintiff. Newman Funeral Home has offices in Batesville and Charleston, Mississippi, both of which do only general undertaking in Panola and Tallahatchie Counties, respectively. Reynolds Funeral Home, located in Holly Springs, and plaintiff's only local competitor, does general undertaking, and obtains 85% of its business from Marshall County and 15% combined from Union and Benton Counties, which is the same area in which plaintiff operates. It also has an agency contract to sell Class "A" policies for Mississippi Benefit Association of Grenada, Mississippi, and Class "B" insurance for United Funeral Association, Inc., of New Albany. Admittedly, the same individuals own controlling interests in all defendant corporations and their subsidiaries. James Maxey is executive head in charge of these enterprises.

The complaint charges that the defendants are engaged in an unlawful conspiracy to eliminate competition and to monopolize through illegal combination the funeral home business in the State of Mississippi. Specifically, plaintiff alleges restraint of trade to have occurred in the following particulars: that United Funeral Association, Southern Burial Insurance Company and Southern Undertaking Association, sell burial insurance policies directing the holder thereof that the policy can only, or most satisfactorily, be serviced by funeral homes owned by United Funeral Service, Inc., thereby directing the policyholders not to do business with plaintiff or any unaffiliated funeral director; that defendant, United Funeral Service, Inc., has so commingled and interchanged the names of its subsidiaries as to place all funeral homes controlled by it in a superior competitive position; that when plaintiff services a burial policy written by one of the defendant insurance companies and issues credit thereon, such insurance company refuses to make payment on such policy and asserts it is not responsible to pay an unaffiliated funeral home; that, moreover, defendant funeral homes have, through threats of withdrawal of their business, caused various national and area companies selling funeral home supplies to refuse to sell to plaintiff and other members of its class, thus stifling competition and illegally restraining trade.

In addition to denial of charges, special defenses asserted by defendants are: that this suit is improperly brought as a class action under Rule 23, F.R. Civ.P.; that plaintiff regularly utilizes and benefits from the same type restrictive burial insurance policies and, therefore, does not come into this court with "clean hands"; that the alleged actions of defendants are purely local and do not affect interstate commerce; that the exemption of the insurance business contained in the McCarran-Ferguson Act, 15 U.S.C. § 1012(b) [4] removes this ac-

---

4. 15 U.S.C. § 1012(b) provides that "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance * * * unless such Act specifically

tion from the purview of the federal anti-trust statutes; lastly, the action is barred by the four-year statute of limitations provided by 15 U.S.C. § 15b.

On May 14, 1969, an evidentiary hearing before the court, without a jury, developed the following pertinent facts: Plaintiff was incorporated, and commenced funeral parlor business, on December 10, 1966. Its stockholders were Charles Thomas, Clark Cochran, A. Q. Greer, and Wall Doxey, Jr., prominent citizens of Holly Springs. Thomas, the manager, had been in the funeral directing business, and also connected with burial insurance companies, for a number of years prior thereto. Plaintiff's trade area was coterminous with that of Reynolds Funeral Home, which had been the only (white) funeral home domiciled at Holly Springs prior to plaintiff's beginning operations. Reynolds had enjoyed a prior business experience of handling 100 to 120 funerals per year. For a new entrant into a "highly personalized" market, plaintiff apparently was an effective competitor. Of the 124 white funerals conducted in the area during 1967, plaintiff serviced 30 and Reynolds Funeral Home, its competitor in Holly Springs, 94. In 1968, plaintiff conducted 30 funerals as compared to Reynolds' 84. From January 1, 1969, to date of trial, plaintiff serviced 15 funerals in the area. Besides plaintiff and Reynolds, several other funeral directors serve the trade (white) within the specific territorial area. All other defendant funeral homes have one or more white competitors in their respective trade areas, none of whom voluntarily joined as party plaintiff in this action. (See Fn. 3 supra).

It is customary for funeral homes, as agents for burial insurance companies writing Class "A" and Class "B" burial policies, to sell such policies within their market area, as policyholders, in case of death, become "captive business" for the particular funeral establishment. Approximately 70% of funeral business is generated from the policyholders. In many cases, the same policyholder may hold both types of burial contracts, Class "A" and Class "B". These burial policies are adapted from standard forms approved by the State Commissioner of Insurance, and their terms are closely regulated by statute.

A Class "A" policy, deriving its name from Miss.Code § 5597(a), may be in amounts only of $150, $300, or $450, on approved terms, obligating the insurer to furnish, through an authorized funeral home, casket and services or supplies having a retail value equal to the amount named in the policy. Should it be deemed impractical by the authorized funeral home to handle the burial, the insurer has the right to settle its obligation by cash payment of one-half or all of the policy amount, depend upon the applicable rate of premium.[5]

relates to the business of insurance * * * after June 30, 1948 * * * the Sherman Act, and * * * the Clayton Act * * * shall be applicable *to the business of insurance to the extent that such business is not regulated by State law.*" (Emphasis added)

5. § 5597(a), Miss.Code 1942, provides, in relevant part:

"(a) * * * Any such person, firm, association, or corporation organized under this subsection may issue contracts or burial certificates in amounts not to exceed one hundred fifty dollars ($150.00), provided said person, firm, association, or corporation deposits securities with the Treasurer of the State of Mississippi according to the schedule set out heretofore, with a minimum deposit of not less than one thousand dollars ($1,000.00) par value, and a maximum amount of securities not to exceed ten thousand dollars ($10,-000.00). Provided, however, that said person, firm, association, or corporation organized under this subsection may also issue contracts or burial certificates in amounts not to exceed three hundred dollars ($300.00), provided said person, firm, association, or corporation deposits securities with the Treasurer of the State of Mississippi according to the schedule set out heretofore, with a minimum deposit of not less than two thousand dollars ($2,000.00) par value, and a maximum amount of securities not to exceed twenty thousand dollars ($20,000.00) par value. Provided further, that said person, firm,

A Class "B" policy, taking its name from § 5597(b), is written in face amount of not less than $250 nor more than $500 on contract forms to be approved by the Commissioner, providing for contract benefits to be limited to applying the face amount of the policy toward the retail value of funeral merchandise and services with cash settlement benefits provided, at the option of the insuring association, where it is not practicable for the authorized funeral home to handle the burial. The chief difference in a Class "B" policy seems to be that it is written by burial associations having a minimum of $25,000 paid in stock in addition to legal reserves being posted with the State Treasurer in the same manner as is required of domestic life insurance companies.[6]

Plaintiff, although writing for other burial associations Class "A" and "B" policies containing the noted restrictions, undertook to handle, and through its business advertising encourage, policyholders in other companies to have

---

association, or corporation organized under this subsection may also issue contracts or burial certificates in amounts not to exceed four hundred fifty dollars ($450.-00), provided said person, firm, association, or corporation deposits securities with the Treasurer of the State of Mississippi according to the schedule set out heretofore, with a minimum deposit of not less than three thousand dollars ($3,000.-00) par value, and a maximum amount of securities not to exceed thirty thousand dollars ($30,000.00).

\* \* \* \* \*

All contracts, issued by a person, firm, association, or corporation of any of the above classifications, will be issued in amounts of one hundred fifty dollars ($150.00), three hundred dollars ($300.-00), or four hundred fifty dollars ($450.-00) only.

\* \* \* \* \*

All policies written under authority of subsection (a) of this section shall contain the standard provisions hereinafter enumerated:

STANDARD PROVISIONS

(1) *The association will not be responsible for casket or any other funeral supplies or expenses contracted for by anyone unless authorized by the association, subject to minimum cash settlement hereinafter provided.*

\* \* \* \* \*

(8) *Should death occur where the funeral home named herein deems it impractical for the association to service this contract, the association reserves the right to pay not less than fifty per cent (50%) of the face value of of the certificate to which the member is entitled.* Provided, however, if premium rates of not less than ten per cent (10%) in excess of the rates described herein are requested by the association and approved by the commissioner, the standard provisions contained in this paragraph may provide for a cash settlement up to one hundred per cent (100%) of the face value of the contract." (Emphasis added)

6. Pertinent provisions of § 5597(b) are as follows:

"(b) Provided, however, after passage of this act, a burial association may enter into burial insurance contracts with citizens of this state in a face amount of not less than two hundred fifty dollars ($250.-00), nor more than five hundred dollars ($500.00) for the funeral of any one person to be paid by any such burial association subject to strict compliance with the following requirements as an absolute condition precedent to any such policy or contract being written or in force in this state:

(1) Such a burial association must be incorporated under the provisions of Chapter 1, Title 22 of the Mississippi Code of 1942, and at least twenty five thousand dollars ($25,000.00) in capital stock paid up before the commencement of business by any such corporation may be authorized.

(2) Only contracts with uniform benefits may be written, which must be first approved by the commissioner of insurance, and such contracts may be written on a basis of payment of premiums for life or alternatively to be paid up in not less than fifteen (15) years after date of issuance. *Contract benefits shall be limited to applying the face amount of the contract toward the retailed value of funeral merchandise and service; however, such contracts may provide for cash settlement benefits.* (Emphasis added)

\* \* \* \* \*

(6) Securities shall be deposited with the state treasurer equal to one half (½) of the capital stock of such companies and associations, and securities covering reserve liabilities shall likewise be deposited with the state treasurer in the amounts and manner as is not required of domestic life insurance companies."

their funeral services rendered by plaintiff rather than by the funeral home authorized in such policies. Since its opening, plaintiff has conducted 12 funerals where the deceased were covered by policies authorizing Reynolds Funeral Home to perform funeral services, and this has resulted in an aggregate loss of $3,300 on the insurance benefits promised, although in each case it was practicable for Reynolds to perform the service. The loss was absorbed by plaintiff and was not charged to the customers.

Charles Thomas, plaintiff's business manager, encountered certain difficulties in obtaining funeral supplies identical to those sold by the suppliers to Reynolds Funeral Home, but he did not know for a fact that Reynolds, or the defendant organizations, was responsible therefor; he merely detected unwillingness on the part of certain supply representatives directly to sell him items exactly as they sold to his local competitor. In no instance did plaintiff establish this reluctance to be the result of an agreement, express or implied, with the defendant organizations. James Maxey positively denied that he had requested an exclusive arrangement with the suppliers, or that he had entered into such an understanding. Of the five suppliers of funeral home products alleged to have been coerced by defendants from dealing with plaintiff, representatives of two companies appeared as witnesses for the defense and successfully explained their failure to sell to plaintiff.[7] The Deeton-Kennedy Company, a distributor of memorial books and small metal grave markers, is represented in five southeastern states, including Mississippi, by Mr. "Hub" Howard. Howard testified that in late 1966 he called upon Charles Thomas and Wall Doxey, Jr., who requested that he furnish plaintiff with books and grave markers similar to those sold by him for fourteen years to its Holly Springs competitor, Reynolds Funeral Home. Howard declined to do so, as it was his practice not to sell the same or identical articles to competitors. With 30–40% of his customers, he refused to sell to a local competitor but in other cases he saw fit to sell any item to anyone, without qualification. Maxey knew nothing about this practice until it was later discussed. That company manufactures for sale some thirty varieties or styles of books and markers, any of which he would have readily sold to plaintiff, except that used by Reynolds. Approximately 25 to 30 salesmen competitive to Howard sell like products of good quality to funeral homes, and they operate in the Holly Springs area.

Also appearing at trial as defense witness was Ed Gilliam of Ruston, Louisiana, who covers the tri-state area of Arkansas, Louisiana and Mississippi for Dodge Chemical Company, manufacturers and distributors of chemicals and cosmetics used in the embalming process. Gilliam testified that he had had contacts with Holly Springs Funeral Home on only two occasions. On the first instance, he declined to sell it second-hand equipment of a type in which his company did not deal, but referred Thomas to another source, Pav Chemical Company, and, on the second, he sold it a quantity of cosmetics in late 1966 or early 1967. He stated that, although it was his practice not to sell identical or similar products to competitors, there were five companies competing with Dodge Chemical Company who could have sold plaintiff products similar to those used by Reynolds. Also, Gilliam did not have the exclusive franchise to sell Dodge products in the tri-state area, so that any other salesman of Dodge Chemical could have sold that company's products to plaintiff, including products similar to those used by Reynolds. Maxey never attempted to influence him not to sell to plaintiff. The evidence presented with respect to Southern Casket Company is sketchy, at best, but we conclude therefrom that

7. Companies other than those respecting which evidence was adduced at trial were Lunsford-Wilson Company of Atlanta, Georgia, and the Aurora Casket Company of Aurora, Indiana.

Reynolds bought a minimal amount from that company, and if it did not sell to plaintiff, it was due, as with Deeton-Kennedy and Dodge, to no understanding, threats or coercion on the part of Maxey or Reynolds Funeral Home.

It is necessary to examine only three contentions, to-wit: (a) the propriety of this case as a class action; (b) the exemption of burial insurance business in Mississippi from the operation of the Federal Anti-Trust Statutes by reason of the McCarran–Ferguson Act; and (c) the existence of an agreement in restraint of trade between defendant organizations and funeral home suppliers for the latter not to sell to plaintiff, thus resulting in a conspiracy to stifle competition.

### I.

 Rule 23(a), F.R.Civ.P., provides that a member of a class may sue on behalf of all other members thereof only if all the following prerequisites are met:

" * * * (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."

Although defendants denied in their answer that this suit was properly brought as a class action, the preliminary question was not brought to the court's attention prior to trial as the Rules require.[8] However, from an examination of the pleadings and evidence in this case, we are clear that it was improvidently so brought.

Initially, the evidence illustrates that the trade areas of several funeral homes operated by defendants are confined to an area within 50–85 miles of the business establishment. In each community where a defendant funeral home is located, there is at least one competitor, but in no case are there more than two. Thus, even considering that the business of defendants might overlap into adjoining counties to compete with funeral homes there, there could not be many affected thereby, probably not more than ten and, at the very most twelve. Although the evidence is unclear on this question, it seems extremely unlikely that the affected homes would be " * * * so numerous that joinder of all members is impracticable * * *." Moreover, it is not shown that any of this small number is "not owned, operated or controlled by burial insurance companies", the purported class.

While failure to show an unwieldly number of class members is alone sufficient to defeat a class action, we think it of significance to note that there are no "questions of law or fact common to the class." First, plaintiff cannot be heard to attack the right of burial insurance companies to provide in their policies that payment need not be made for services performed by unauthorized funeral homes. Such provision has been approved by the Mississippi Legislature and the State Insurance Commissioner, and, as such, is exempt from the anti-trust laws. See infra. Although plaintiff charged inability of defendants' competitors to purchase from their suppliers, because of an illegal agreement between them, no proof whatsoever was introduced with respect to any competitor other than itself. Finally, plaintiff, as a sole party, may not be deemed to fairly insure the adequate representation of all members of the purported class. It has not been made to appear that plaintiff's interests are coextensive with other independent funeral homes operating in North Mississippi, which had no direct connection or affiliation with a burial insurance association, so as to exclude the possibility of antagonistic positions and interests arising among them.

8. Rule 23(c) (1), F.R.Civ.P. provides that:
"As soon as practicable after the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained."

Consequently this suit may not be maintained as a class action and will be considered as one by Holly Springs Funeral Home against its immediate competitor, Reynolds Funeral Home.

## II.

■■ By the adoption of the McCarran-Ferguson Act on March 9, 1945, Congress conclusively settled that the continued regulation of the insurance industry by the several states was in the public interest, that such business should be subject to the laws of the several states,[9] and that from and after June 30, 1948, the federal anti-trust statutes would be applicable to the business of insurance only "to the extent that such business is not regulated by State law." 15 U.S.C. § 1012(b). See Fn. 4, supra.[10] The only exception would be an agreement to, or act of, boycott, coercion or intimidation not here applicable.[11] This statute reflected the public policy of refraining from interference with regulation of insurance companies by the several states, United States v. Sylvanus, 7 Cir., 192 F.2d 96 (1951), and of giving broad, national support to state regulation of the insurance business by throwing the weight of Congressional power behind state systems, Allstate Ins. Co. v. Lanier, 4 Cir., 361 F.2d 870 (1966). It is

only when a state has not acted that federal legislation becomes effective. Monarch Life Ins. Co. v. Loyal Protective Life Ins. Co., 326 F.2d 841 (2 Cir. 1963, cert. den. 1964). A state "regulates" the business of insurance within the meaning of 15 U.S.C. § 1012(b), when it "generally proscribes * * * or permits or authorizes certain conduct on the part of the insurance companies". California League of Independent Insurance Producers v. Aetna Casualty & Surety Co., D.C., 175 F.Supp. 857, 860 (1959). Cf. FTC v. National Cas. Co., 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540 (1958). Whether the statutory plan of a state's regulation of insurance "embodies the wisest and most effective type of regulation" is not for the courts to decide. Allstate v. Lanier, supra.

Mississippi has long had statutes extensively regulating the insurance business, and its Legislature in 1956 enacted additional statutes by the passage of Miss.Code §§ 5649–01 through 5649–12, designed to effectuate further the exemption intended by the Act of Congress.[12] Those statutes added new standards of unfair competition and unlawful practices applicable to insurance companies and vested the Commissioner of Insurance with power to issue cease and desist orders.

9. 15 U.S.C. § 1011. Declaration of policy, provides:

"Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States."

15 U.S.C. § 1012(a) provides:

"(a) The business of insurance, and every person engaged therein shall be subject to the laws of the several States which relate to the regulation or taxation of such business."

10. This statute was passed in response to the holding of United States v. South-Eastern Underwriters Association, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed.2d 1440 (1944), that there had been no effectual exclusion of the business of insurance

from the operation of the Sherman Anti-Trust Act.

11. 15 U.S.C. § 1013(b) provides:

"(b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation."

12. Miss.Code § 5649–01 provides as follows:

"The purpose of this act is to regulate trade practices in the business of insurance in accordance with the intent of Congress as expressed in the Act of Congress of March 9, 1945 (Public Law 15, 79th Congress), by defining, or providing for the determination of, all such practices in this state which constitute unfair methods of competition or deceptive practices and by prohibiting the trade practices so defined and determined."

■ Since we are dealing with burial insurance, it becomes pertinent to examine the scope and extent of state regulation relating to that particular field of insurance. The State's regulatory laws [13] fully occupy the field of regulation, and thereby make exempt burial insurance business in this state from the operation of the Sherman and Clayton Acts. Plaintiff argues in the case at bar that it is not the burial insurance business but the funeral home business which is being restrained, and, therefore, the exemption relating to the insurance industry is not applicable. This argument completely overlooks the fact that it is the burial associations, and not funeral homes, which issue policies providing for the payment of stated amounts in funeral merchandise and service; this is the act of the insurer, who becomes liable for cash settlement only in the event that it is impracticable for an authorized funeral home to handle the funeral. Policies containing these restrictions authorized by state law are sold to the public by burial insurance associations. A funeral home, as such, has no contractual obligation with anyone; it remains free to solicit burials, irrespective of burial insurance; and if burial insurance covers a funeral serviced by a home, it is in most cases a credit, either partial or less than total, on the funeral service account between the home and its customer. Mississippi has seen fit to regulate burial insurance in this manner, and to authorize the conduct of such business so that only in the rare or exceptional case are cash payments made and the policyholder left uninfluenced in his selection of a funeral home. It can only be concluded that the burial insurance company restrictions complained of in this case do not constitute a violation of the federal anti-trust statutes.

### III.

■ Unlike the charge of unlawfully restrictive burial insurance policy provisions, the claim that Reynolds, through its superior economic position, coerced its suppliers not to deal with plaintiff concerns only the business of funeral services, and, as such, is not exempt from the anti-trust legislation.

■ Group boycotts, or concerted refusals by wholesalers to deal with retailers, whether at the behest of the stricken retailers' competitor, or that of other wholesalers, are per se violative of the Sherman Act.[14] That is, such combinations are saved neither by allegations that they were reasonable under the circumstance, nor even that they actually stimulated competition. "[S]uch agreements, no less than those to fix minimum prices, cripple the freedom of traders and thereby restrain their ability to sell in accordance with their own judgment." Kiefer-Stewart Co. v. Joseph E. Seagram

---

13. § 5592 renders a burial association unlawful unless organized under this chapter.

§§ 5593 and 5597 relate to applications made for license, plans of business operations and forms of contracts to be filed with the Commissioner of Insurance; returns of premiums to be approved; and names of all persons interested in business to be disclosed.

§ 5594 prescribes standards for articles of incorporation and approval by Commissioner of Insurance.

§ 5597(a) and (b) deal in detail with the types of burial associations, policy provisions and requirements for operation.

§ 5598 requires filing of annual reports with Commissioner of Insurance, giving full information.

§ 5599 levies the tax for the privilege of engaging in burial insurance business.
§ 5600 empowers Commissioner of Insurance to revoke license to do business upon the failure to adhere to the approved policy form or to collect and return the approved rate of premium or to comply with any other statutory requirements.

14. See, e. g., Klor's v. Broadway-Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Eastern States Retail Lumber Dealers Assn. v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914); Binderup v. Pathe Exchange, Inc., 263 U.S. 291, 44 S.Ct. 96, 68 L.Ed. 308 (1923); Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

& Sons, 340 U.S. 211, 213, 71 S.Ct. 259, 260, 95 L.Ed. 219, 223 (1951).

█ At the other end of the spectrum, however, are the cases wherein a wholesaler unilaterally refused to deal with a given retailer. It is the right, long recognized, of a trader engaged in an entirely private business, freely to exercise his own independent discretion as to the parties with whom he will deal.[15]

As " * * * a wholesale dealer has the right to stop dealing with a manufacturer * * * because he thinks such manufacturer is undermining his trade by selling to a competing wholesaler * * *," Federal Trade Commission v. Raymond Bros.-Clark Co., 263 U.S. 565, 44 S.Ct. 162, 68 L.Ed. 448 (1924), so must he have the right to refuse to deal with retailers for fear he may thereby lose the business of the retailer's competitor, so long as his refusal is not a result of agreement with the competitor.

What we have here is a situation closely analogous to that where a manufacturer or distributor of a product desires that its product be marketed by a single retailer in a given area. In such cases, the manufacturer "has a right to select its customers and to refuse to sell its goods to anyone, for reasons sufficient to itself." United States v. Colgate & Co., supra. "A refusal to deal becomes illegal under the [Sherman] Act only when it produces an unreasonable restraint of trade, such as price fixing, elimination of competition or the creation of a monopoly." United States v. Parke Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505 (1960).

In Ace Beer Distributors, Inc. v. Kohn, Inc., 6 Cir., 318 F.2d 283, 287 (1963) a suit by a distributor, who had formerly held exclusive area franchise for sale of defendant's beer, for alleged unlawful combination to terminate his franchise and give it to a competitor, the Court held that:

"The fact that a refusal to deal with a particular buyer without more, may have an adverse effect upon the buyer's business does not make the refusal to deal a violation of the Sherman Act. * * *

The present case does not involve price fixing. Nor does it involve an attempt to create a monopoly. The [defendant] had one distributor in the territory * * * before it terminated plaintiff's franchise. It continued to have only one distributor thereafter. There is no allegation or contention that the beer of other brewers was not just as available in that area after the change in distributors as it was before."

█ The evidence decidedly indicates that the decisions of the Deeton-Kennedy and Dodge Chemical representatives not to sell identical or similar products to plaintiff as were sold to Reynolds, were not the result of agreement with Reynolds, but were according to long-standing policies which the companies deemed beneficial to their businesses. Plaintiff's charge of unlawful combination respecting these two companies is simply without basis in the record, and although the evidence is not nearly so clear as to Southern Casket, the issue of credibility must be resolved in favor of defendants. Moreover, the record shows that products identical to those used by defendants were availiable to plaintiff upon request to other funeral home suppliers in the area.

As plaintiff has shown neither per se violation of the anti-trust laws, nor any monopoly, or attempt to monopolize, on the part of defendants, this cause should be dismissed with prejudice, and an order will be entered accordingly.

---

15. See, e. g., United States v. Colgate & Co., 250 U.S. 300, 39 S.Ct. 465, 63 L.Ed. 992 (1919); United States v. Bausch & Lomb Optical Co., 321 U.S. 707, 64 S.Ct. 805, 88 L.Ed. 1024 (1944); Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951).