410 F.Supp. 1343 (1976)
Joseph A. ZELSON, Plaintiff,
v.
PHOENIX MUTUAL LIFE INSURANCE COMPANY, a corporation, and Phoenix Equity Planning Corporation, a corporation, Defendants.
No. 75-625C(1).
United States District Court, E. D. Missouri, E. D.
February 3, 1976.
*1344 Charles A. Seigel, St. Louis, Mo., for plaintiff.
Kenneth S. F. Teasdale and Edwin L. Noel, St. Louis, Mo., for defendants.

MEMORANDUM
MEREDITH, Chief Judge.
This action is before the Court on defendants' motion to dismiss. For the reasons stated below, the motion shall be granted.
Plaintiff, who is engaged in the sale and service of insurance coverages, securities, and the design, installation, and service of pension and welfare plans, was an agent of defendant Phoenix Mutual Life Insurance Company (hereinafter Phoenix Mutual) from March 1953 to September 1, 1974, under a contract whereby plaintiff was licensed to solicit applications for all insurance coverages offered by Phoenix Mutual, to deliver policies, to collect certain premiums thereon, and to service said insurance business.
Thereafter, plaintiff, in order to make available to his clients various securities and variable annuities, became a registered representative of a broker-dealer of securities, the North American Securities Corporation (hereinafter North American). Subsequently, defendant Phoenix Equity Planning Corporation (hereinafter PEPCO), a wholly-owned subsidiary of defendant Phoenix Mutual, was incorporated as a broker-dealer, in competition with plaintiff and North American.
Plaintiff has brought this treble-damages action under section 4 of the Clayton Act, 15 U.S.C. § 15, alleging that defendants, in violation of sections 1, 2, and 3 of the Sherman Act, 15 U.S.C. §§ 1, 2, and 3, and section 3 of the Clayton Act, 15 U.S.C. § 14, unlawfully combined and conspired to force plaintiff, under threat of cancellation of plaintiff's contract with Phoenix Mutual, to withdraw as a registered representative of North American and become a registered representative of defendant PEPCO only. Plaintiff, in order to maintain his contract with Phoenix Mutual, did withdraw as a registered representative of North American and became a registered representative of defendant PEPCO. Subsequently, finding PEPCO's services *1345 unsatisfactory, he withdrew as a registered representative of defendant PEPCO and, as a result, his contract with defendant Phoenix Mutual was terminated as of September 1, 1974.
Defendants concede that plaintiff's contract was terminated by defendant Phoenix Mutual because of his refusal to remain a registered representative for defendant PEPCO, and argue that defendant Phoenix Mutual's policy of requiring its agents to sell equity products under the supervision and control of PEPCO, its wholly-owned brokerage subsidiary, is a necessary tool in the supervision of its agents and the protection of its policyholders' insurance investments.
As grounds for their motion to dismiss, defendants assert that the challenged practices are exempted from the federal antitrust laws by the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015. The McCarran-Ferguson Act, which exempts the business of insurance from federal antitrust laws to the extent that the state involved has enacted similar legislation and so long as the act complained of is not one of boycott, coercion, or intimidation, reads in pertinent part:
"Section 1012 . . . (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That . . . the Sherman Act, . . . the Clayton Act, . . . as the Federal Trade Commission Act . . . shall be applicable to the business of insurance to the extent that such business is not regulated by State law."
"Section 1013 . . . (b) Nothing contained in this chapter shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation."
Plaintiff contends that defendants' actions are not sheltered by the McCarran-Ferguson Act antitrust exclusion because the practices complained of, even though taken by an insurance company, are not the "business of insurance" within the meaning of section 1012; that even if they were, there is not state law regulating the specific matter in issue; and that defendants' actions fall within the section 1013(b) exception for boycott, coercion, or intimidation.
The Supreme Court in S.E.C. v. National Securities, Inc., 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), set forth the standard to be used in determining whether a challenged practice is the "business of insurance" within the meaning of section 1012(b). Finding that Congress in enacting the McCarran-Ferguson Act "was mainly concerned with the relationship between insurance rate-making and the antitrust laws, and with the power of the States to tax insurance companies," the Court stated:
"The statute did not purport to make the States supreme in regulating all the activities of insurance companies; its language refers not to the persons or companies who are subject to state regulation, but to laws `regulating the business of insurance.' Insurance companies may do many things which are subject to paramount federal regulation; only when they are engaged in the `business of insurance' does the statute apply. Certainly the fixing of rates is part of this business; that is what South-Eastern Underwriters was all about. The selling and advertising of policies, FTC v. National Casualty Co., 357 U.S. 560 [78 S.Ct. 1260, 2 L.Ed.2d 1540] (1958), and the licensing of companies and their agents, cf. Robertson v. California, 328 U.S. 440 [66 S.Ct. 1160, 90 L.Ed. 1366] (1946), are also within the scope of the statute. Congress was concerned with the type of state regulation that centers around the contract of insurance, the transaction which Paul v. Virginia [8 Wall 168, 19 L.Ed. 357,] held was not `commerce.' The relationship between insurer and insured, the type of policy *1346 which could be issued, its reliability, interpretation, and enforcement  these were the core of the `business of insurance.' Undoubtedly, other activities of insurance companies relate so closely to their status as reliable insurers that they too must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was  it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, directly or indirectly, are laws regulating the `business of insurance.'" 393 U.S. at 459-60, 89 S.Ct. at 568-569, 21 L.Ed.2d at 676.
The question before this Court is not whether the brokering of securities and variable annuities by an insurance company is the "business of insurance," although it has been held that neither are. U. S. v. Meade, 179 F.Supp. 868 (S.D.Ind.1960); S.E.C. v. United Benefit Life Ins. Co., 387 U.S. 202, 87 S.Ct. 1557, 18 L.Ed.2d 673 (1967). Rather, this Court must determine whether an insurance company's requirement that its own agents sell equity products under the exclusive supervision and control of its wholly-owned brokerage subsidiary is the business of insurance. Defendant Phoenix Mutual argues that, since the agent in selling an equity product is speaking for the company, such control is necessary as an indirect protection of the insurer-insured relationship, both to protect "the policyholder's insurance investment and his reliance on Phoenix Mutual's reputation and local agents."
Several recent cases have applied the National Securities standard to alleged tying practices of insurance companies and found them within the scope of the statute. In Dexter v. Equitable Life Assurance Society of the United States, 527 F.2d 233, 19752 Trade Cases ¶ 60,601 (2d Cir. 1975), and Addrisi v. Equitable Life Assurance Society of U. S., [503 F.2d 725 (9th Cir. 1974), cert. denied, 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400 (1975), the insurance-lender practice of tying the granting of mortgage loans to the purchase of life insurance was held sheltered from antitrust scrutiny since "[a]n insurance company's methods of inducing people to become policyholders pertain to the company-policyholder relationship, and thus constitute an integral part of `the business of insurance.'" Dexter, supra, 527 F.2d at 235. Similarly, the tying of burial insurance benefits to the use of "authorized" funeral homes was held to be within the scope of section 1012(b) because the requirement was a term of the contract between the insurance company and the policy holder. Holly Springs Funeral Home v. United Funeral Service, Inc., 303 F.Supp. 128 (N.D.Miss.1969).
Although the above cases are grounded on the direct effect of the challenged practice on the insurance company-policyholder relationship, other cases applying National Securities have held that the section 1012(b) exclusion is not strictly limited to insurer-insured matters, specifically where the practice is directly and substantially related to insurance ratemaking. Travelers Insurance Co. v. Blue Cross, 481 F.2d 80 (3d Cir.), cert. denied 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550 (1973) (favorable reimbursement contract with hospitals serving policyholders); Schwartz v. Commonwealth Land Title Insurance Co., 374 F.Supp. 564 (E.D.Pa.1974) (fixing of seller charges by title insurance companies).
Challenged practices which do not affect the insurance company-policyholder relationship directly, or indirectly through their impact on ratemaking, have not found shelter under the Act. The Court in Hill v. National Auto Glass Inc., 1971 Trade Cases, ¶ 73,594, p. 90,459 (N.D.Cal. June 1, 1971), finding that "Congress at no time indicated an intent to give insurance companies carte blanche to operate in concert with noninsurance companies," held that a combination between an automobile insurance company and a glass company to allocate business, fix prices, and boycott other glass setters was not the "business of insurance." In Battle v. Liberty National Life Ins. Co., 493 F.2d 39 (5th Cir. *1347 1974), cert. denied 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975), a burial insurance company's practice of requiring funeral directors and homes, in order to become "authorized" for servicing their burial insurance policyholders, to contract with the insurance company's wholly-owned subsidiary for merchandise and services, was not protected by section 1012(b).
The above two cases differ significantly from the case at bar. Here plaintiff, in addition to his business as a life insurance agent, maintained the closely related business of acting as an investment counselor, designing and servicing pension and welfare plans through the sale of securities and variable annuities. In both Hill and Battle the challenged practices involved arrangements between persons who had no direct contractual relationship with the insurance company as policyholders or agents, but who were engaged in entirely different businesses. Any relationship the practices might have had on ratemaking were so attenuated as to be insignificant.
The public forms its view of the reliability and integrity of an insurance company through its dealings with the company's agents. As a result, insurance companies must maintain close supervision over the activities of their agents. By controlling the brokerage activities of its agents, Phoenix Mutual is engaged in the "business of insurance" as defined in National Securities, supra, 393 U.S. at 460, 89 S.Ct. at 568, 21 L.Ed.2d 676 both in "protecting and regulating" the insurance company-policyholder relationship and in maintaining its "status as a reliable insurer."
The antitrust laws are applicable to the business of insurance only "to the extent that such business is not regulated by State law." 15 U.S.C. § 1012(b). Defendant argues that two provisions of the Missouri code cover the challenged practices: section 375.930 et seq., R.S. Mo.1959, prohibiting unfair methods of competition and unfair and deceptive practices in the insurance industry, and section 416.031(3), R.S.Mo.1949, as amended (supp. 1974), the newly revised antitrust statute. As plaintiff points out, this cause of action arose before the enactment of section 416.031(3), and must be determined under the law in effect at the time the alleged damage was incurred, section 416.040, R.S.Mo. 1949.
Plaintiff argues that the necessary state regulation is not present since the unfair practices section of the insurance code does not specifically prohibit the type of tying agreement challenged here, and the state antitrust law in effect at the time the activities occurred did not prohibit such activities.
The Sixth Circuit has held, in an opinion approved by the Eighth Circuit in Lawyers Title Co. of Missouri v. St. Paul Title Ins. Corp., 526 F.2d 795 (8 Cir. 1975), that "if a state has generally authorized or permitted certain standards of conduct, it is regulating the business of insurance under the McCarran Act." Ohio AFL-CIO v. Insurance Rating Board, 451 F.2d 1178, 1181 (1971), cert. denied 409 U.S. 917, 93 S.Ct. 215, 34 L.Ed.2d 180 (1972). The Missouri code, sections 375.930 et seq., generally regulates unfair trade practices by insurance companies, and in section 375.936 defines a list of specifically prohibited practices. Plaintiff argues that the requirement of section 1012(b) is not met since the challenged practice is not among those listed in section 375.936. However, "[s]tate power to regulate necessarily includes the discretion to prohibit, permit, or limit insurance practices as the state sees fit . . . If the exemption is only to apply when state law squarely prohibits all acts which would, absent the exemption, violate the antitrust laws, the state regulation which the McCarran-Ferguson Act aims to foster . . . would be a nullity." Dexter v. Equitable Life Assurance Society of the United States, 527 F.2d 233, 236 (1975-2 Trade Cases ¶ 60,601 at 67,655 (2d Cir. 1975).
This Court finds that section 375.930 et seq., provides the necessary state regulation. It, therefore, does not reach the question of coverage by the state antitrust *1348 laws, although it notes the opinion in Gerecht v. American Ins. Co., 344 F.Supp. 1056 (W.D.Mo.1971), which implies that life insurance companies are not covered by section 416.040.
Plaintiff argues that defendant Phoenix Mutual's refusal to deal with him unless he agreed to sell equity products exclusively through defendant PEPCO brings the challenged practice within section 1013(b) of Title 15, U.S.C., which renders the antitrust exclusion of section 1012(b) inapplicable to acts of boycott, coercion, or intimidation. In its usual sense the term "boycott" means a concerted agreement to refrain from doing business with certain others or an inducement of others not to do business with others. Cooperative de Sequros Multiples v. San Juan, 294 F.Supp. 627 (D.P.R.1968). "[It] does not apply to cases where persons are urged to do business with another." Transnational Ins. Co. v. Rosenlund, 261 F.Supp. 12 (D.Ore.1966). By requiring plaintiff to conduct its brokerage activities under its supervision and control, defendant Phoenix Mutual has not engaged in an illegal boycott.
Because plaintiff's complaint must be dismissed under the McCarran-Ferguson Act, the Court need not reach defendant PEPCO's claims of immunity under federal and state securities laws.