Sylvia PERRY, Individually and on behalf of all others similarly situated, Plaintiffs-Appellants,

v.

FIDELITY UNION LIFE INSURANCE COMPANY, Defendant-Appellee.

No. 76–2709.

United States Court of Appeals, Fifth Circuit.

Jan. 2, 1979.

Dissenting Opinion Oct. 26, 1979.

Rehearing and Rehearing En Banc Denied Dec. 10, 1979.

Thomas G. Keith, Atty., Legal Aid Society of Madison County, Huntsville, Ala., George A. Moore, Huntsville, Ala., for plaintiffs-appellants.

Ralph H. Ford, Huntsville, Ala., for defendant-appellee.

Before BROWN, Chief Judge, THORNBERRY and MORGAN, Circuit Judges.

THORNBERRY, Circuit Judge:

In *Cochran v. Paco, Inc.*, 606 F.2d 460 (5 Cir. 1978), we held today that the lending activities of a premium finance company do not constitute the "business of insurance" and that the McCarran-Ferguson Act ("McCarran Act"), 15 U.S.C. §§ 1011 *et seq.*, does not preclude application of the disclosure requirements of the Truth in Lending Act ("TIL"), 15 U.S.C. §§ 1601 *et seq.*, to the transaction.

The instant case, the second in today's trilogy,[1] presents a related question: whether the McCarran Act bars TIL's application when an insurance company provides premium financing in connection with the sale of an insurance policy. The district court held that the McCarran Act was a good defense to plaintiff's TIL action and granted summary judgment for the defendant insurance company. We reverse.

## I. FACTUAL BACKGROUND

Sylvia Perry was a college student in Alabama when a salesman from Fidelity Union Life Insurance Co. sold her a life insurance policy in June, 1974. To obtain the policy, which had annual premiums of $295, she made a $10 down payment and executed a promissory note to Fidelity for the remainder of the first year's premium. Fidelity provided Perry a form entitled "Disclosure Statement and Acceptance of Policy,"[2] which stated that she would be paying $134 in interest over the five-year life of the note. Perry made no further payments on the note, which was ultimately assigned to a bank.

On June 24, 1975, Perry, on behalf of herself and all persons similarly situated, filed this suit, alleging that she had entered into contractual relations with Fidelity in the nature of a consumer credit transaction and that Fidelity's disclosure forms violated TIL and Regulation Z, 12 C.F.R. § 226.1 et seq.[3] She sought the statutory penalty for herself and the class, costs, and attorneys' fees.[4] Following discovery, Fidelity successfully moved for summary judgment on the ground that the McCarran Act barred application of TIL to the Perry transaction.

The district court, in an unreported opinion, held that (i) the disclosure of credit information of a premium financing arrangement is part of the business of insurance; (ii) the State of Alabama has exercised its power to regulate the premium financing aspect of the business of insurance; and (iii) application of TIL to this particular transaction would require a construction of TIL that would invalidate, im-

---

1. The third case is *Cody v. Community Loan Corp.,* 606 F.2d 499 (5 Cir. 1978).

2. This statement provides, in pertinent part:

    (3) Cash Price of Policy (Annual Premium) _____$295.58

    (4) Cash Downpayment _____$ 10.00

    (5) Unpaid Balance of Cash Price _____$285.58

    (6) Unpaid Balance _____(Same as Item 5)

    (7) Amount Financed _____(Same as Item 5)

    (8) Total FINANCE CHARGE (interest) _____$134.03

    (9) Deferred Payment Price (3 + 8) ___$429.61

    (10) Total of Payments (5 + 8) _____$419.61

    The Total of Payments is payable in a single payment due 6–13–79, except if the above Policy terminates, the Note may be declared immediately due and payable.

    (11) ANNUAL PERCENTAGE RATE __ 8.00%

    (12) Date of Note _____6–13–74

    (13) Finance Charge Accrues From ____6–13–74

    Record at 46.
    Had Perry paid later premiums, she would have received a cash payment at the end of the fifth year (the policy's fifth anniversary endowment) that would have covered a substantial portion of the first year's premium.

3. Perry alleged the following violations of TIL:
    (1) failure to disclose the finance charge as an accurate annual percentage rate comput-

ed in accordance with the provisions of 15 U.S.C. §§ 1606, 1638(a)(7), and 12 C.F.R. §§ 226.5(b), 226.8(b)(2);
    (2) failure to furnish a completed, duplicate copy of the disclosure statement containing all the required disclosures prior to the consummation of the consumer credit transaction as required by § 226.8(a);
    (3) failure to disclose the "total down payment" as required by § 226.8(c)(2);
    (4) use of the term "cash price of policy (annual premium)" instead of "cash price," as required by §§ 226.6(a), 226.8(c)(1); and
    (5) use of the term "total finance charge (interest)" instead of "finance charge," as required by §§ 226.6(a), 226.8(c)(7).
    Record at 3.
    After discovery, Perry admitted that if the finance charge was correctly reported, the annual percentage rate was accurately computed. However, she sought to amend the complaint to allege that the finance charge was too low and the cash price too high. The record is silent as to whether this amendment was allowed.

4. 15 U.S.C. § 1640(a). Count II of the complaint presented a state law claim. At the pretrial conference the parties agreed to submit the case on the sole issue of the McCarran Act defense, on which Fidelity prevailed, and the state law claim is thus not before us.

pair or supersede Alabama law enacted for the purpose of regulating the business of insurance. This appeal followed.[5]

## II. DISCUSSION

■■■ Our opinion in *Cochran v. Paco, Inc., supra,* establishes the analytical framework for determining the applicability of the McCarran Act. Since we held in *Cochran* that TIL does not specifically relate to the business of insurance, 606 F.2d at 464, we turn immediately to the next inquiry, that is, whether Fidelity's premium financing activities, carried out in connection with its sale of an insurance policy, constitute the "business of insurance." We hold that it does not and that the McCarran Act is no bar to the application of TIL. Accordingly, we need not determine whether Alabama has "any law enacted . . . for the purpose of regulating" the financing activities or whether TIL would "invalidate, impair, or supersede" such state law. *Cochran, supra,* 606 F.2d at 467 n.15.

There is no doubt that the sale of an insurance policy is squarely within the "business of insurance." *Securities & Exchange Comm'n v. National Securities, Inc.,* 393 U.S. 453, 460, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969). However, the financing of such a sale is a different activity. As we said in *Cochran,* premium financing "has little—if any—effect on an insurance company's ability to pay claims or on the nature of [its] policies" and "has only a peripheral connection with the business of insurance," 606 F.2d at 466–467. We do not think that the nature of premium financing changes, in chameleon-like fashion, simply·because an insurance company rather than a loan or finance company authors the promissory note. Not all insurance company activities constitute the business of insurance, and the McCarran Act does not insulate every operation of every insurance company from federal regulation. *Cochran, supra,* at 465 n.13.

It would be anomalous to hold that Fidelity's premium financing activities are the "business of insurance" but that the identical activities of the finance company in *Cochran* are not. The appropriate focus is thus the nature of the activity itself, not the type of business that is conducting it.

In making available premium financing, an insurance company is acting not as an insurer but as a creditor, and the financing activity is purely ancillary to the insurance relationship between the insurance company and the policyholder. Premium financing has virtually nothing to do with a company's reliability as an insurer, a factor that stands at the center of the insurer-insured relationship. *National Securities, supra.* When an insurance company offers premium financing as an inducement for persons to purchase policies, it plays two distinct roles in its relationship with the purchaser. On the one hand, the company is an insurer, the purchaser an insured; but on the other hand, the company is a creditor, the purchaser a debtor. The former relationship constitutes the "business of insurance," while the latter does not.

We do not doubt that an insurance company can, by offering a premium financing package, facilitate the sale of insurance policies. But that alone cannot elevate the activity to the "business of insurance," for one can hardly claim that the extension of credit is an integral part of the insurance business. As we have said in the antitrust context, business activities of insurance companies not peculiar to the insurance industry are outside the scope of the "business of insurance." *Royal Drug Co. v. Group Life & Health Ins. Co.,* 556 F.2d 1375, 1386 (5 Cir. 1977); *see also Battle v. Liberty Nat'l Life Ins. Co.,* 493 F.2d 39, 50 (5 Cir. 1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975).[6]

---

**5.** The Board of Governors of the Federal Reserve System filed in this appeal the same *amicus curiae* brief submitted in support of appellant's position in *Cochran v. Paco, Inc., supra.*

**6.** We recognize that other courts, in other contexts, have held that an insurance company's inducing persons to become policyholders is part of the business of insurance. *E. g., Dexter*

Accordingly, we hold that premium financing by an insurance company does not constitute the "business of insurance" within the meaning of the McCarran Act and that the McCarran Act is thus no bar to the application of TIL's disclosure requirements. The judgment of the district court is reversed and the case remanded for further proceedings consistent with this opinion.

REVERSED and REMANDED.

JOHN R. BROWN, Chief Judge, dissenting:

This appeal presents the esoteric question whether § 2(b) of the McCarran-Ferguson Act (the McCarran Act), 15 U.S.C.A. § 1012(b), bars the application of the disclosure requirements of the Truth-in-Lending Act, 15 U.S.C.A. §§ 1601 *et seq.* (TIL) when an insurance company provides premium financing in connection with the sale of an insurance policy in Alabama, and the form used in disclosing the credit terms to the policyholder has been submitted to and approved by the Department of Insurance as required by Alabama law. I agree with the District Court that the McCarran Act is a good defense to the action and dissent from the contrary holding of the Court.

### I. *Prologue*

Building on *Cochran v. Paco's*[1] holding, in which I concurred that a non-insurance company premium financing enterprise is not engaged in "the business of insurance," the Court makes a mighty leap to conclude that when the premium financing is extended directly by the selling insurance company, this is likewise not the "business of insurance."

Its principal thesis is that (i) premium financing—by whomsoever advanced—does not concern or affect the "relationship between insurer and insured, the type of policy which could be issued, its reliability, [interpretation] and enforcement," *SEC v. National Securities, Inc.,* 1969, 393 U.S. 453, 460, 89 S.Ct. 564, 569, 21 L.Ed.2d 668, 676 (quoted in *Cochran, ante,* 606 F.2d at 465), and (ii) in extending premium financing "an insurance company is acting not as an insurer but as a creditor"[2] so that (iii) "the financing activity is purely ancillary to the insurance relationship between the"[3] insurer and policy holder.

There are a number of faults with this approach, some of which warrant the later detailed discussion.

At the outset, I firmly believe that that which insurance companies regularly and customarily do in the solicitation and sale of policies of insurance is, and is to be considered as, a part of the "business of insurance." And yet here there is not a single stitch of record evidence that premium financing is or is not a regular, accepted part of the insurance business. On the contrary, all that we have is the Court's statement that this activity is merely ancillary—a fact drawn presumably from the wisdom Article III and life tenure generate.

In the next place, the very activity under scrutiny is so much a part of the business of insurance that it is precisely regulated by the Alabama Superintendent of Insurance[4] pursuant to the Department's authority to regulate and superintend insurance companies, not lenders of credit. And these regulations specifically relating to the sale of

v. *Equitable Life Assurance Soc'y,* 527 F.2d 233 (2 Cir. 1975) (antitrust action challenging Equitable's requirement that plaintiff purchase life insurance as precondition to granting mortgage loans); *Addrisi v. Equitable Life Assurance Soc'y,* 503 F.2d 725 (9 Cir. 1974), *cert. denied,* 421 U.S. 922, 95 S.Ct. 1590, 43 L.Ed.2d 790 (1975) (same). However, in these cases the inducement was actually a requirement, and forcing prospective policyholders to buy insurance cannot be equated with making the purchase "easier" by offering premium financing. Moreover, if this "inducement" rationale were applied in the financing context, the activities of any lender who engages in premium financ-

ing would constitute the "business of insurance." We have rejected such a result in *Cochran v. Paco, Inc., supra,* and application of the "inducement" theory in the instant case would make the McCarran Act's applicability turn on *who* is engaged in premium financing rather than on the *nature* of that activity.

1. 5 Cir., 1979, 606 F.2d 460.

2. Majority opinion, *ante,* 606 F.2d at 470.

3. Majority opinion, *ante,* 606 F.2d at 470.

4. See note 22, *infra.*

life insurance to college students [5] reflect an awareness by Alabama insurance authorities that sales practices—including extension of liberal premium financing—go to the very heart and integrity of the selling insurer.

For example, the regulations condemn the practice of inducing the college student applicant to drop or replace existing insurance (see note 22, *infra*, item 11) and recommend that a financed program should not be *sold* to an undergraduate on a basis where premiums would come due prior to the anticipated date of graduation by the insured (see note 22, *infra*, item 10). The guidelines are enacted in the " * * * hope * * * of offering additional safeguards for the protection of this segment of the insurance buying public." (Note 22, *infra*, introduction).

Whatever this Court might think, it is plain that Alabama believes that the method of selling insurance, including the insurer's extension of premium financing, goes to "the type of policy which could be issued [and] its reliability." *SEC v. National Securities, Inc., supra*, 1969, 393 U.S. at 460, 89 S.Ct. at 568.

And the Court's effort to camouflage the problem by declaring that it " * * * would be anomalous to hold that [the insurers'] premium financing activities are the 'business of insurance' but that the identical activities of the finance company in *Cochran* are not," [6] is not only bad law. It is worse economics. The principal difference is that with a premium financing company the insurer bears none of the risk of late or non-payment. It is paid in full, subject only to possible rebate of unearned premiums if the financier has and exercises a right of cancellation in the event of default by the policyholder-borrower. And this distinction is not obliterated by the insurer's discounting of the premium note to, say, a third party bank. The assignee would nor-

mally have recourse against the insurer-assignor. So the risk—and the consequent diminution of the insurer's assets—remains on the insurer.

Finally, it is an artificial oversimplification to speak in terms, not of insurer and insured, but of debtor and creditor. Life insurance is customarily sold with installment premiums—semiannually, quarterly, monthly, or the like. And yet under regulations of the state insurance authorities, the terms of the policy, or both, a grace period, usually of thirty days is afforded. Clearly that is extension of credit, but it is equally clear that this goes to the very heart of the relationship between insurer and insured and to the continued integrity of the policy.

Next, on failure to pay premiums, it is common for the policy, pursuant to local state regulation, to provide for paid up insurance of a specified amount or extended insurance for the policy limit for a specified period of time. This is, albeit sophisticated, credit reflecting a debtor-creditor relationship but indeed much more, a relationship between insurer and insured.

Similarly, again pursuant to state regulation, life insurance policies generally provide for policy loans to the extent of the paid up or cash loan surrender value. Once such a loan is procured there is, to be sure, the debtor-creditor relationship, but it arises out of the continuing insurer-insured relationship.

It must come as quite a surprise to the nation's multi-billion dollar insurance enterprises to learn that premium financing is not an integral part of the "business of insurance" but is a mere incidental appendage of the debtor-creditor relationship.

This, in my judgment, ignores the legislative history and purposes of the McCarran

---

5. Regulation by the states has a dual function. First, as urged here, it demonstrates that that which insurance authorities regulate must be a part of "the business of insurance." Second, as developed later on, it meets the subsidiary question outlined in *Cochran*, 606 F.2d at 463 of regulation by the state and impairment of state regulation.

6. *Perry, ante*, 606 F.2d at 470.

Act. The activities here are thus exempt from TIL as the District Court properly held. I therefore respectfully dissent.

## II. The Legislative History Of The McCarran Act

In *Paul v. Virginia,* 1869, 75 U.S. (8 Wall.) 168, 183, 19 L.Ed. 357, the Supreme Court held that the issuance of an insurance policy was not a transaction of commerce. For the three-quarters of a century following *Paul,* it was assumed that the regulation of insurance transactions rested exclusively with the states. However, *United States v. South-Eastern Underwriters Assn.,* 1944, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440, gave lie to that assumption, the Court holding that insurance transactions stretching across state lines were subject to federal regulation under the Commerce Clause and that federal antitrust laws applied to them. Both Houses of Congress, characterizing *South-Eastern* as "precedent-smashing," H.R.Rep.No.143, 79th Cong., 2d Sess. (1945), *reprinted in* 1945 U.S.Code Cong.Serv. 670, 671; S.Rep.No.20, 79th Cong., 1st Sess. 2 (1945), reacted quickly and legislative reversal of *South-Eastern* was accomplished by the McCarran Act.[7] (See discussion of the McCarran Act in *Cochran v. Paco, ante,* 606 F.2d at 462–463.)

The House Report which accompanied the bill demonstrates Congress' intent to return matters to the status quo ante:

It is not the intention of Congress in the enactment of this legislation to clothe the States with any power to regulate or tax the business of insurance beyond that which they had been held to possess prior to the decision of the United States Supreme Court in the Southeastern Underwriters Association case. . . .

H.R.Rep.No.143, *supra,* 1945 Code Cong. Serv. at 671; *see SEC v. National Securities, Inc.,* 1969, 393 U.S. 453, 459, 89 S.Ct. 564, 568, 21 L.Ed.2d 668, 676. The proviso of § 2(b) served as an invitation to the states to legislate in the antitrust field during the moratorium period.

Thus, it is clear that Congress returned to the states the plenary power to regulate the business of insurance which they had previously enjoyed.[8] Congressional "silence" (see § 1012(a) quoted in *Cochran, ante,* 606 F.2d at 462) meant that states were free to occupy the insurance business field subject to controlling Supreme Court decisions prior to *South-Eastern. See* H.R.Rep.No. 143, *supra,* at 671–72. On the other hand, when Congress desired to invoke its Commerce Clause powers to occupy any part of the field then or in the future, it would expressly say so.[9] Stated another way, Congress wanted to ensure that no future federal legislation enacted under the Commerce Clause, not specifically relating to insurance, would be construed an an implied

---

**7.** Because Congressional debate principally focused on the application of federal antitrust laws to the business of insurance—a subject of only peripheral concern to us here—we believe it helpful to attach as an Appendix excerpts from the Congressional debates on the McCarran Act which concerned state regulation of insurance companies in non-antitrust areas. Some excerpts focusing on antitrust are also included because of their implications in other areas. These excerpts appear in chronological order and have been numbered for easy reference.

**8.** This power was understood to be constitutionally limited by the states' inability to regulate outside its borders. *See FTC v. National Casualty Co.,* 1958, 357 U.S. 560, 78 S.Ct. 1260, 2 L.Ed.2d 1540; Atwell, The McCarran-Ferguson Act—A Deceptive Panacea?, 5 *The Forum*

339, 340 (1970); Appendix, excerpts [9], [10], [12].

**9.** The Supreme Court enumerated the two ways in which Congress gave its support to existing and future state systems for regulating and taxing the business of insurance:

One [way] was by removing obstructions which might be thought to flow from its own power, whether dormant or exercised, except as otherwise expressly provided in the Act itself or in future legislation. The other was by declaring expressly and affirmatively that continued state regulation and taxation of this business is in the public interest and that the business and all who engage in it 'shall be subject to' the laws of the several states in these respects.

*Prudential Ins. Co. v. Benjamin,* 1946, 328 U.S. 408, 429–30, 66 S.Ct. 1142, 1155, 90 L.Ed. 1342, 1360. See Appendix, excerpts [11], [12], [18].

repeat of the McCarran Act which sanctioned continued state regulation.[10]

Moreover, I also glean from the legislative history of the McCarran Act that the states were free to regulate as they saw fit. For example, the following statement appears in S.Rep.No.1112, 78th Cong., 2d Sess., 5 (1944):

> If the States are to be permitted to regulate, they should be permitted to regulate as they each see fit. The committee believes that in considering the nature of the business of insurance, its closeness to policyholders in the several States, the established systems of regulation and control by the States, and the experience and attitude of State insurance commissioners, regulation by the States should not be circumscribed by the establishment of any control over their power of regulation or the exercise by them of that power.

See also H.R.Rep.No.873, 78th Cong., 1st Sess., 9 (1943): [11]

> Insurance is also fundamentally local in character, and therefore best regulated by the States. . . . All insurance policies are entered into in one State or another and that State in which they are entered into may through State regulation meet all problems presented. If regulation be undertaken by the Federal Government this must inevitably result in a general pattern which is not applicable in meeting the requirements of the different States as they should be met and as those States now meet them. The fundamental fact is that under the law as it exists today each State has ample power to regulate as it may see fit. How it regulates is a matter for it to determine. . . . State regulation has promoted efficiency and satisfaction in the insur-

---

10. See, for example, the following remarks of Senator Ferguson:

> If there is on the books of the United States a legislative act which relates to interstate commerce, if the act does not specifically relate to insurance, it would not apply at the present time. Having passed the bill now before the Senate, *if Congress should tomorrow pass a law relating to interstate commerce, and should not specifically apply the law to the business of insurance, it would not be an implied repeal of this bill [the McCarran Act], and this bill would not be affected, because the Congress had not, under subdivision [2](b), said that the new law specifically applied to insurance.* I think that makes the bill very clear.

91 Cong.Rec. 481 (Jan. 25, 1945) (emphasis added). See also Appendix, excerpts [1], [2], [4]–[7], [22].

Although the Court rejects it, I think it helpful to give a detailed answer to the contention made by the Federal Reserve Board in its amicus brief which states:

> An examination of the legislative history of the McCarran-Ferguson Act indicates that Congress originally intended that [the] McCarran-Ferguson Act's prohibition of Federal preemption of State laws regulating the business of insurance only be applicable to insurance-related activities otherwise within the purview of Federal antitrust laws. The [state] Act under consideration most certainly is not an antitrust statute.
>
> \* \* \* \* \* \*
>
> . . . [W]hen Congress spoke of State regulation of the business of insurance, it was concerned with the States' regulating

what would have been covered potentially by the Federal antitrust laws.

Amicus brief at 16–18.

The Board is asserting that TIL should apply because the only state regulatory legislation within the purview of the McCarran Act is that correspondent to the federal antitrust laws. As does the Court, I reject this contention as totally without merit. The plain words of the Act itself are dispositive on this score. For example, state tax laws relating to the business of insurance are expressly covered by 15 U.S.C.A. §§ 1011, 1012(a), (b). Tax laws, as far as we known, have nothing to do with antitrust laws. And if the plain words of the statute were not enough, the remarks of Senator Ferguson quoted above and those of other Congressmen set forth in the Appendix (see excerpts [1], [2], [5], [7], [11], [12], [14], [16], [17], [18], [19], [20], [22], [24]) should dispel all doubts. Moreover, § 4 of the McCarran Act, 15 U.S.C.A. § 1014, which makes the National Labor Relations Act and the Fair Labor Standards Act specifically applicable to the business of insurance serves as a further demonstration of a crystal clear intent that Congressional silence meant the states were free to regulate insurance in areas having no relationship to antitrust.

11. Both S.Rep.No.1112 and H.Rep.No.873 related to an earlier version of the Act, H.R. 3270. *See generally* Note, A Year of S.E.U.A., 23 Chi.Kent L.Rev. 317 (1945); Comment, Federal Regulation of Insurance Companies: The Disappearing McCarran Act Exemption, 1973 Duke L.J. 1340, 1342 & n.12.

ance business, and . . . such a result has been accomplished with a steady decrease in insurance rates throughout the country. . . . [T]here is no reason why the States should not continue to meet developments by the exercise of that power.

Subsequent decisions have recognized that, at the time of the Act's passage, Congress was well aware that the states' regulatory schemes differed widely and that uniformity of regulation was not a McCarran Act purpose except in respects expressly provided for then and down the road. *See, e. g., Prudential Ins. Co. v. Benjamin,* 1946, 328 U.S. 408, 430–31, 66 S.Ct. 1142, 90 L.Ed. 1342, 1360–61; *Dexter v. Equitable Life Assurance Soc.,* 2 Cir., 1975, 527 F.2d 233, 236; *Ohio AFL–CIO v. Insurance Rating Board,* 1971, 6 Cir., 451 F.2d 1178, 1183, *cert. denied,* 409 U.S. 917, 93 S.Ct. 215, 34 L.Ed.2d 180. See Appendix, excerpts [3]–[6]. In 1945, Congress stilled its power, and Courts have subsequently eschewed power to decide which state regulatory scheme is best or whether the state scheme represents the wisest and most effective type of regulation. See Appendix, excerpts [1], [2], [5], [7], [11], [12], [14], [16]–[20], [22], [24]; *Commander Leasing Co. v. Transamerica Title Ins. Co.,* 10 Cir., 1973, 477 F.2d 77, 84; *Allstate Ins. Co. v. Lanier,* 4 Cir., 1966, 361 F.2d 870, 873, *cert. denied,* 385 U.S. 930, 87 S.Ct. 290, 17 L.Ed.2d 212; *McIlhenny v. American Title Ins. Co.,* E.D.Pa., 1976, 418 F.Supp. 364, 370; *Fleming v. Travelers Indemnity Co.,* D.Mass., 1971, 324 F.Supp. 1404, 1406; *Holly Springs Funeral Home v. United Funeral Serv., Inc.,* N.D.Miss., 1969, 303 F.Supp. 128, 135. Following the instruction of the Supreme Court, we must . . . start with a reluctance to disturb the state regulatory schemes that are in actual effect, either by displacing them or by superimposing federal re-

quirements on transactions that are tailored to meet state requirements. When the States speak in the field of 'insurance,' they speak with the authority of a long tradition.

*SEC v. Variable Annuity Co.,* 1959, 359 U.S. 65, 68, 79 S.Ct. 618, 620, 3 L.Ed.2d 640, 643.

### III. *Specifics*

Against this background, and in light of McCarran Act jurisprudence, I proceed on the basis of this Court's analysis in *Cochran v. Paco, ante,* 606 F.2d at 464 to determine (i) whether TIL "specifically relates" to the business of insurance, (ii) if not, whether premium financing constitutes the "business of insurance," and (iii) if so, whether Alabama has enacted regulatory laws (iv) which would be "invalidated, impaired or superseded" by TIL.

### A. *"Specifically Relates"*

I agree with the Court's resolution in *Cochran, ante,* 606 F.2d at 464, of the initial question: TIL does not "specifically relate to the business of insurance" within the meaning of § 2(b) of the McCarran Act, 15 U.S.C.A. § 1012(b). Nowhere in TIL is there the equivalent of § 4 of the McCarran Act,[12] 15 U.S.C.A. § 1014, which specifically relates TIL's provisions to the business of insurance. Nor is there any other indication in TIL that we should construe that statute as an implied repeal of the McCarran Act.

### B. *"Business of Insurance"*

It is with regard to the second issue that I most strongly disagree with the majority. In the companion case, *Cochran v. Paco,* we held that, according to *National Securities,* "the key factor is the relationship between the insurer and the insured," *ante,* 606 F.2d at 466. *Cochran* involved no such relationship since the defendant was not an

---

12. 15 U.S.C.A. § 1014 provides:

§ **1014. Applicability of National Labor Relations Act and Fair Labor Standards Act of 1938**

Nothing contained in this chapter shall be construed to affect in any manner the application to the business of insurance of the Act

of July 5, 1935, as amended, known as the National Labor Relations Act, or the Act of June 25, 1938, as amended, known as the Fair Labor Standards Act of 1938, or the Act of June 5, 1920, known as the Merchant Marine Act, 1920.

Mar. 9, 1945, c. 20, § 4, 59 Stat. 34.

insurance company, but an independent premium finance company. Therefore, I believe we reached the correct result by there holding the McCarran Act inapplicable. But I cannot agree that the *National Securities* rule compels the same result in the instant case where the insurer-insured relationship does exist. The District Court concluded that "the availability of premium financing is a part of the sale of an insurance policy, and the disclosure of the terms and conditions of such an arrangement directly pertains to "the relationship between the insurer and the policyholder." (Unpublished opinion at 6.) I must agree.

Although the Court does not expressly embrace *American Family Life Assurance Co. v. Planned Marketing Assoc.*, E.D.Va., 1974, 389 F.Supp. 1141, it indirectly relies on this decision to attack the District Court holding in the instant case, *ante*, 606 F.2d at 470. *American* stated that business activities *not peculiar* to the insurance industry were subject to federal law. Thus, the Court today holds that *credit disclosure* is "not peculiar" to the insurance industry and TIL should apply.

We believe the Court conveniently ignores what the "not peculiar" language of *American* actually meant. The activities which were stated to be "peculiar" to the industry were precisely those set forth in *National Securities*:

> Acts peculiar to the insurance industry would include such things as the relationship between the insurer and the insured, the language and content of an insurance policy, the financial reliability of an insurance company and other similar matters involved in the insurance industry.

389 F.Supp. at 1145. *American* thus did no more than coin a shorthand phrase for the *National Securities* standard.[13] To adopt

the interpretation of "not peculiar" which Perry urges would mean, for example, that ratemaking and advertising—activities certainly not "peculiar" to the insurance industry in any sense of the word—fall outside the scope of the McCarran Act. And the Supreme Court has expressly stated in *National Securities* that these activities constitute the business of insurance (see quote from *National Securities* in *Cochran, ante*, 606 F.2d at 465.

I have found no cases directly on point, but there are some which provide guidance. In *Gerlach v. Allstate Ins. Co.*, S.D.Fla., 1972, 338 F.Supp. 642 (discussed in *Cochran, ante*, 606 F.2d at 466), it was stated in dictum:[14]

> Florida law, as part of the Florida Insurance Code, regulates insurance premium finance companies and premium financing . . . ., and specifically sets forth . . . what disclosures are required in a premium financing agreement. Thus, although Allstate's transaction is not premium financing, this Florida regulatory legislation on the same subject as Truth in Lending, namely, disclosure, would have precluded applicability of Truth in Lending in insurance premium consumer credit transactions in Florida.

*Id.* at 650.

While I join the Court in impliedly declining to adopt this sweeping language, I do believe that when an insurance company offers premium financing as part of the inducement to purchase a policy of insurance, that inducement is as integrally related to the sale of the policy as is, say, advertising, and such activity necessarily falls within the business of insurance. It would be anomalous to hold that advertising practices hawking to the world at large the advantages of insurance fall within

---

**13.** This Circuit has recently applied the "not peculiar" test in a factual situation far different from the one presently before us. In *Royal Drug Co. v. Group Life & Health Ins. Co.*, 5 Cir., 1977, 556 F.2d 1375, the Court held that an agreement between a group insurer providing prescription drugs and participating pharmacies did not constitute the business of insurance for McCarran Act purposes. The Court,

relying on *National Securities*, cited *American* for the "not peculiar" holding. *Id.* at 1386. Nothing we say here is inconsistent with *Royal* which did not involve a direct insurer-insured relationship.

**14.** For an appraisal of *Gerlach, see* Krischer, "Truth" in Insurance Premium Financing, 30 *Business Lawyer* 969, 973–74 (1975).

McCarran and a loan of money—an inducement to purchase made directly to the policyholder by the insurance company—does not. Other courts, in different contexts to be sure, have used the "inducement" reasoning to apply McCarran.

Before turning to two other cases which I find helpful on this issue, I emphasize again, as discussed[15] in *Cochran, ante*, 606 F.2d at 464, that there is no reason not to apply standards developed in antitrust cases in interpreting the terms of the McCarran Act. "Regulating" for antitrust purposes does not mean something different than "regulating" for purposes other than antitrust.[16] It is well to remember what the Supreme Court said in *National Securities.* "Statutes aimed at protecting or regulating this relationship [between the insurance company and the policyholder], directly or indirectly, are laws *regulating* the 'business of insurance.'" 393 U.S. at 460, 89 S.Ct. at 569, 21 L.Ed.2d at 676 (emphasis added). To be sure, *National Securities* focused on what comprised the insurance business, but there is not a hint in that or any Supreme Court case of which we are aware—and Perry cites none—that the fine distinction asserted is warranted.

In *Dexter v. Equitable Life Assurance Soc.*, 2 Cir., 1975, 527 F.2d 233, 235, the plaintiff brought an antitrust action against Equitable for requiring him to purchase life insurance as a precondition to granting mortgage loans. Following *Addrisi v. Equitable Life Assurance Soc.*, 9 Cir., 1974, 503 F.2d 725, *cert. denied*, 1975, 420 U.S. 929, 95 S.Ct. 1129, 43 L.Ed.2d 400, the Second Circuit held that the challenged tying arrangement was part of the business of insurance under *National Securities'* insured-insurer relationship standard. The Second Circuit stated:

> An insurance company's methods of inducing people to become policyholders pertain to the company-policyholder relationship, and thus constitute an integral part of 'the business of insurance.'

*Id.* at 235.

The Court would distinguish these cases by saying that the purchase of insurance "was actually a requirement, and forcing prospective policyholders to buy insurance cannot be equated with making the purchase 'easier' by offering premium financing." *Ante*, 606 F.2d at 471, note 6. While premium financing may make the purchase of insurance "easier" for some, I am sure there are many others for whom such financing is quite necessary in order to acquire insurance coverage. In any event, premium financing is certainly as much an inducement for the purchase of insurance as advertising, which is covered by the McCarran Act exemption. In sum, I find these cases parallel the facts before us and do give us guidance.

In effect, the Court adopts Perry's attempt to avoid the hard cold fact that this transaction was between the insurer and the policyholder by pointing out that Fidelity negotiated the promissory note to a bank. She argues that the effect of the note created a separate debtor-creditor relationship between Perry and a different entity. Thus, she asserts, Fidelity "has created an arrangement with a third party which, although possibl[y] related to the 'business of insurance', is nevertheless 'so

---

**15.** The legislative history of the Act is less extensive in areas outside the antitrust sphere—and understandably so. *South-Eastern*, after all, was an antitrust case and Congressional debate focused primarily on reversing its effects. See, for example, the Senate debate on the Conference Report attached as an Appendix to the dissent of Judge Godbold in *Crawford v. American Title Ins. Co.*, 5 Cir., 1975, 518 F.2d 217, 230–36.

**16.** The argument to the contrary seems to be that McCarran antitrust cases address primarily two issues: (i) Is the activity within the business of insurance? and (ii) To what extent is the business regulated by state law? On the other hand, in non-antitrust cases, Perry argues, a third issue must be decided, namely, does the application of the relevant federal law "invalidate, impair, or supersede" the state law? From this, Perry asserts that the antitrust cases defining "regulate" cannot be read in a vacuum apart from the cases construing "invalidate, impair, or supersede." For reasons addressed hereinafter, we do not believe that the District Court was guilty of this analytical mistake. See Part III–C, *infra*.

remotely related' as to remain subject to not inconsistent requirements of Federal laws like the Truth-In-Lending Act, and outside the protection of the narrow McCarran Act exemption."

I fail to see what possible bearing the subsequent negotiation of Perry's promissory note could have on the original transaction between Perry and Fidelity insofar as the McCarran Act is concerned. Perry was and remained the policyholder and Fidelity was and remained the insurer. The later negotiation may have created a new and separate debtor-creditor relationship between Perry and the bank, but that new relationship did not alter or supplant in any respect the original, ongoing Perry-Fidelity consanguinity.

Finally, the Court holds in effect that the loan was not vitally connected with the insurance policy; in other words, Perry could have paid cash and avoided financing altogether. The theory is that financing of the premiums is unrelated to the policy, its reliability, interpretation or enforcement. No authority is cited to support this theory which I believe defies both precedent and logic. First, the Supreme Court teaches that the litmus test is *not* a "vital connection" between the activity and the policy; it is the connection between the insurance company and the policyholder and what

transpires between them—the " 'insurance' relationship," with which Congress was concerned. *National Securities*, 393 U.S. at 460, 89 S.Ct. at 568–69, 21 L.Ed.2d at 676. Second, I cannot see any less vital connection between that insurance relationship and premium financing on the one hand, and advertising, for example, on the other. Obviously the precise metes and bounds of the term "business of insurance" are far from clear and we need not set them here. But where, as in the present case, the core relationship exists, we are well within McCarran, no matter how broadly or narrowly its exemption is construed.[17]

C. *"Regulating"* -

Although the Court did not address this issue, I must face it under *Cochran's* analytical approach as succeeding steps to achieve affirmance, not reversal. In 1957, Alabama—expressly responding to the Congressional invitation extended by the specific moratorium in the McCarran Act[18] —passed the Insurance Trade Practices Law, Title 28A, § 227 *et seq.*, Code of Alabama. Section 228 specifically forbids "any trade practice which is defined in this chapter as, or *determined pursuant to this chapter to be,* . . . an unfair or deceptive act or practice in the business of

---

**17.** The cases cited by Perry to support the proposition that credit disclosure is not the business of insurance are inapposite: *Hamilton Life Ins. Co. v. Republic Nat'l Life Ins. Co.,* S.D.N.Y., 1968, 291 F.Supp. 225, aff'd, 2 Cir., 1969, 408 F.2d 606; *Hart v. Orion Ins. Co.,* 10 Cir., 1971, 453 F.2d 1358; *Sears, Roebuck & Co. v. All States Life Ins. Co.,* 5 Cir., 1957, 246 F.2d 161; *United States v. Sylvanus,* 7 Cir., 1951, 192 F.2d 96 (McCarran Act not a defense to indictment for use of mails to defraud in the sale of insurance policies); *Hill v. National Auto Glass Co.,* N.D.Cal., 1968, 293 F.Supp. 295; *Fry v. John Hancock Mutual Life Ins. Co.,* N.D.Tex., 1973, 355 F.Supp. 1151; *American Family Life Assurance Co. v. Planned Marketing Assoc.,* E.D.Va., 1974, 389 F.Supp. 1141. Of these cases only *Hart* and *Fry* involved a direct relationship between the insured and the insurer. In *Hart,* the plaintiff sought to invoke the arbitration provision in his policy and the Court held that the states involved did not regulate the business of insurance. 453 F.2d at 1360. The Court never reached the question whether arbitration constituted the business of insurance. *Fry* is equally unhelpful to Perry since the District Court later reversed itself in light of *Addrisi, supra,* in an opinion which unfortunately was not published, Civil No. CA–2–1301, N.D.Tex., Amarillo Div., June 5, 1975.

**18.** Ala.Code tit. 28A, § 227(1) provides:

The purpose of this chapter is to regulate trade practices in the business of insurance in accordance with the intent of congress as expressed in the act of congress of March 9, 1945 (Public Law 15, 79th Congress [ch. 20, 59 U.S.Stat. at Large 33].) by defining, *or providing for the determination of,* all such practices in this state which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined *or determined.* (Emphasis added.) It is obvious that the Alabama Legislature meant to cover not only those acts it specifically proscribed but those determined by the Insurance Commissioner to be unfair or deceptive at a subsequent date.

insurance." (Emphasis added.) The Insurance Commissioner is given various administrative and supervisory powers to enforce the Act's prohibitions. Significantly, those powers extend not only to specific practices banned by the Act, but to unfair practices not defined. Ala.Code tit. 28A, § 247(1) provides in pertinent part:

> Whenever the commissioner has reason to believe that any person engaged in the business of insurance is engaging in this state in . . . any act or practice in the conduct of such business which is not defined in this trade practices law, that such . . . act or practice is unfair or deceptive and that a proceeding by him in respect thereto, would be to the interest of the public, he may issue and

serve such person a statement of the charges in that respect and a notice of hearing thereon . . . .[19]

Furthermore, insurance forms must be submitted to the Commissioner and none can be used without his approval.[20] Forms which are misleading are subject to disapproval or withdrawal of prior approval.[21] Section 28 authorizes the Commissioner to promulgate regulations for the effectuation of the form approval system and other provisions of the Act.

The District Court found first, that pursuant to this authority, the Commissioner had issued guidelines specifically related to the practice of offering life insurance to college students under a premium financing arrangement.[22] Second, the Fidelity-Perry

---

**19.** § 247(2) provides for instigation of court proceedings:

> (2) If such report charges a violation of this trade practices law and if such method of competition, act or practice has not been discontinued, the commissioner may, through the attorney general of this state, at any time after thirty (30) days after the service of such report, cause a petition to be filed in the circuit court of this state within the circuit wherein the person resides or has his principal place of business, to enjoin and restrain such person from engaging in such method, act or practice. The court shall have jurisdiction of the proceeding and shall have power to make and enter appropriate orders in connection therewith and to issue such writs as are ancillary to its jurisdiction or are necessary in its judgment to prevent injury to the public pendente lite.

**20.** Ala.Code tit. 28A, § 321 reads in part:

> (1) No basic insurance policy or annuity contract form, or application form where written application is required and is to be made part of the policy or contract, or printed rider or endorsement form or form of renewal certificate, shall be delivered, or issued for delivery in this state, unless the form has been filed with and approved by the commissioner.

**21.** Under § 322, the Commissioner may disapprove the forms on several grounds, three of which are relevant here: (i) if the form violates or fails to comply with Title 28A; (ii) if it has any title, heading, or other indication of its provisions which is misleading; and (iii) if it contains provisions which are unfair, inequitable, or contrary to the public policy of Alabama or which would, because such provisions are unclear or deceptively worded, encourage misrepresentation.

**22.** These guidelines, which delineate the purposes they were designed to serve, are set forth in full:

> JANUARY 1, 1971
> *Effective January 15, 1971*
> SUBJECT: GUIDELINES TO BE FOLLOWED BY COMPANIES OFFERING LIFE INSURANCE PLANS TO COLLEGE STUDENTS UNDER A PREMIUM FINANCING ARRANGEMENT
> Proceeding under the assurance that a Life Insurance Plan sold to a College Student is:
> (a) A good source of business for life insurance companies.
> (b) A good plan on which young people can establish a sound financial insurance program.
> It is felt, nevertheless, that this type of program presents certain areas of concern, particularly in the presentation of the policy when a premium financing arrangement is offered in connection with the sale of it.
> In hope of strengthening this type of marketing procedure and at the same time offering additional safeguards for the protection of this segment of the insurance buying public, the following guidelines and procedures will be adopted by all companies and their agents offering this type policy in this state.
> 1. If the insured is a minor and executes a promissory note for the payment of the first year's premium, such note must be co-signed by the insured's parent, legal guardian, or adult spouse.
> 2. The giving of a promissory note in connection with the first premium must be set out in the application over the applicant's signature, showing the amount of the note, and the amount of any down payment made to an agent at the time of sale. (Note—It is strongly recommended by this office that a down payment be required as a prudent procedure.)

form at issue [23] had been both submitted to and approved by the Commissioner. Third,

3. If a note is taken to finance less than the full first year premium, the balance must be paid by the applicant at the time the application is taken.

4. This down payment must be paid by the applicant in cash or by valid executed note and any payment, directly or indirectly, by the agent under any circumstances shall be construed to be a rebate or special inducement.

5. A copy of the note and any assignment must be attached to the policy, or in lieu thereof, the policy may contain a provision or endorsement which describes such financing arrangement.

6. Upon delivery, a policy receipt or acceptance form must be executed which recites that:

(a) The policy has been issued as represented

(b) The insured acknowledges and understands the provisions and obligations of the financial indebtedness that he has incurred.

7. Such receipt or acceptance form (outlined in Item 6 above) should be registered by number (preferably corresponding to policy number) in the home office.

(a) This receipt must be sent with the policy at time of delivery *only.*

(b) These receipts or acceptance forms shall not be made available as supplies to field representatives or agents but must be furnished from the Home Office in transmittal of the policy to the writing agent.

8. Promissory notes should not be sold or otherwise transferred by the payee (agent), nor any commissions on the sale paid to the agent until such form (outlined in Item 7 above) has been received in the Home Office of the Company.

9. The note purchaser, assignee, or company shall notify the note maker (Insured) and all co-makers regarding the purchase or transfer of the note, *after* such purchase or transfer, inviting any questions relative to the note, or the policy which is used as collateral security for the note.

10. Maximum amount of any financing arrangement which can be executed in connection with such a transaction will be in accordance with reasonable and sound underwriting practices as determined by the management of the company. (Note—It is the recommendation of this Office that a financed program should not be sold to an undergraduate on a basis where premiums would come due prior to the anticipated date of graduation by the insured.)

11. The disturbing of any permanent insurance, including the partial or total replacement of any provisions of an existing policy for the purpose of placing additional insurance, will be cause for necessary investigation and review by this Department's personnel.

the Court, applying the definition—a state regulates the business of insurance when it

12. Agents or field representatives of the company who are licensed by this State to represent the company as licensed life agents may not represent, refer to or hold themselves out to the public under any special title or as representatives of any special policy or company division unless otherwise identified as a licensed agent of the company for which he holds a license.

13. In the case of a request being made by an insured expressing a desire to cancel such a policy and premium arrangement, this Office will expect and fully appreciate the cooperation of the company and its agents in bringing such matters to a satisfactory conclusion as expeditiously as possible.

If, at the time the letter of acceptance is presented with the policy to the applicant for his signature and he decides he does not wish the plan, the policy will be returned to the company with his signed request for release. The policy and note will then be cancelled and the applicant released from any liability, and refund made of any down payment.

14. It is recommended that the cash values shown at the time of presentation should be a specimen of the policy being offered and not for a larger policy. For example, if you are selling a $10,000 policy, you should show the values for this policy and not for a $50,000 or $75,000 program. This leads to misunderstanding on the part of the insured when he receives his $10,000 policy and the cash values are less than what he was shown at the time of sale.

*NOTE—If a sales presentation is made for an amount of insurance greater than that sold, then an appropriate summary must be given to the Insured for the exact amount of policy sold not later than the date of delivery.*

15. All sales material, notes, and other forms used in the sale of such programs must be submitted in duplicate with duplicate letters of transmittal at the time that the policy form is submitted for approval. If found acceptable, the duplicate copy of such materials will be returned as "filed". No such material may be used until so "filed" with the Department. No materials may be added or amended unless first submitted and found acceptable as outlined above.

16. Effective Date. This Bulletin shall be effective on and after January 15, 1971.

Done and ordered at Montgomery, Alabama, this 30th day of December A. D., 1970.

R. FRANK USSERY
SUPERINTENDENT OF
INSURANCE

23. See note 2 of the Court's opinion, *ante.*

has generally authorized or permitted certain standards of conduct [24]—concluded that Alabama regulates the business of insurance within the meaning of § 2(b) of the McCarran Act.

Since the Court takes no position on this, I am forced to consider the argument put forward by Perry. She challenges this holding by comparing the meager requirements of the Alabama guidelines to the detailed requirements of TIL. She does not argue that Alabama fails to regulate the business of insurance at all, but that the State does not regulate it in a manner that will fulfill the purpose of TIL: to afford a meaningful comparison of credit terms. Perry essentially contends that form approval is meaningless in the absence of the specific credit disclosure requirements of TIL and posits the possibility that Fidelity could have submitted an entirely different form containing none of the disclosures and still have received approval within the existing regulations.

There are several answers to this contention. First, we have a form on which certain disclosures *were* made (see note 2 of Court's opinion, *ante* ). The State approved *that* form—not a hypothetical one containing fewer or less detailed disclosures.[25] And if we are going to posit possibilities, for all we know the Insurance Commissioner could have determined that the Fidelity form was quite sufficient to make understandable "the provisions and obligations of the financial indebtedness that [s]he ha[d] incurred" (Guidelines, ¶ 6(b)) and that more detailed disclosures à la TIL were unnecessary. *See generally* Davis, Protecting Consumers from Overdisclosure and Gobbledygook: An Emperical Look at the Simplification of Consumer Credit Contracts, 63 Va. L.Rev. 841 (1977); Comment, 19 Buffalo L.Rev. 656, 670 (1970). A comparison of the form here and the TIL violations alleged (notes 2 and 3 of Court's opinion, *ante* ) demonstrates that very technical violations are involved. Under these circumstances, the Alabama Insurance Commissioner could have viewed Fidelity's disclosures as fair and not deceptive.[26]

But we need not play the speculation game. As discussed in Part II, the law is clear that the particular scheme Alabama adopts for regulating the business of insurance is not a matter for the Courts to pass upon so long as it is regulating that business within the meaning § 2(b) as judicially interpreted.

Thus, we come to the definition of "regulating" which was applied below—a state regulates the business of insurance when it has generally authorized or permitted certain standards of conduct. This test was first announced in *California League of Independent Producers v. Aetna Casualty & Surety Co.,* N.D.Cal., 1959, 175 F.Supp. 857, 860. Despite the fact that it has been widely followed with only slight variation elsewhere [27]—and in the Fifth Circuit [28]—Perry

24. This definition was first announced in *California League of Independent Ins. Producers v. Aetna Casualty & Surety Co.,* N.D.Cal., 1959, 175 F.Supp. 857, 860. See text accompanying notes 27 and 28, *infra.*

25. Perry has conceded that there was *some* disclosure by characterizing Fidelity's efforts as "half-hearted compliance" with TIL regulations.

26. [T]he obvious intent of Congress was to set standards by which to achieve meaningful "truth-in-lending" and not to deviously set traps by which windfalls could be reaped by fanciful lawyers.
*Philbeck v. Timmers Chevrolet, Inc.,* 5 Cir., 1974, 499 F.2d 971, 981 n.22, *quoting Andrucci v. Gimbel Bros., Inc.,* W.D.Pa., 1973, 365 F.Supp. 1240, 1243.

27. *E. g., Lawyers Title Co. v. St. Paul Title Ins. Corp.,* 8 Cir., 1975, 526 F.2d 795, 797; *Ohio AFL–CIO v. Insurance Rating Bd.,* 6 Cir., 1971, 451 F.2d 1178, 1181, *cert. denied,* 1972, 409 U.S. 917, 93 S.Ct. 215, 34 L.Ed.2d 180; *Pierucci v. Continental Casualty Co.,* W.D.Pa., 1976, 418 F.Supp. 704, 709; *McIlhenny v. American Title Ins. Co.,* E.D.Pa., 1976, 418 F.Supp. 364, 369; *Mathis v. Automobile Club Inter-Ins. Exchange,* W.D.Mo., 1976, 410 F.Supp. 1037, 1040; *Gerlach v. Allstate Ins. Co.,* S.D.Fla., 1972, 338 F.Supp. 642, 650; *Holly Springs Funeral Home v. United Funeral Serv., Inc.,* N.D.Miss., 1969, 303 F.Supp. 128, 135.

28. *Crawford v. American Title Ins. Co.,* 1975, 518 F.2d 217, 218.

insists that this standard applies in antitrust cases and is not "necessarily relevant in determining whether or not the McCarran Act acts as a bar" to TIL.

By adopting the decision of the District Court for the Northern District of Alabama in *Crawford v. American Title Ins. Co.,* 1975, 518 F.2d 217, 218, this Circuit established [29] the applicable standard for us to follow:

> The McCarran Act renders the federal [act] inapplicable when state legislation generally proscribes, permits or otherwise regulates the conduct in question and authorizes enforcement through a scheme of administrative supervision.

There is no doubt that Alabama has regulated the Fidelity conduct challenged here to a plainly sufficient degree to pass this test. The Alabama statute generally proscribes any act which the Commissioner deems to be unfair and deceptive and has clearly authorized enforcement through a scheme of administrative supervision. Regulations have been issued specifically with regard to the sale of life insurance policies to college students under premium financing arrangements. The Fidelity forms have been submitted and approved. In this connection, other courts have placed weight on state supervision of insurance company contracts and forms in determining whether the state was "regulating" the business of insurance for McCarran purposes. *Travelers Ins. Co. v. Blue Cross,* 3 Cir., 1973, 481 F.2d 80, 83, *cert. denied,* 414 U.S. 1093, 94 S.Ct. 724, 38 L.Ed.2d 550; *Pierucci v. Continental Casualty Co.,* W.D.Pa., 1976, 418 F.Supp. 704, 709. As detailed above, the Commissioner is empowered to remedy deceptive or unfair practices, not only through withdrawal of approval or disapproval of forms but by court action as well.

Perry basically urges us to hold that unless Alabama adopts the same requirements for insurance companies that TIL places on others, it is not "regulating" the business of insurance. But it is not for us to say in what precise manner that State should determine whether Fidelity's credit disclosure practices vis-à-vis its policyholders are unfair or deceptive. Alabama has undertaken supervision of the sale of life insurance policies to college students such as the one sold to Perry and has set the standards which it believes are necessary to protect Alabama insureds. McCarran's "regulating" requirement is thus satisfied.

## D. "Invalidate, Impair, Or Supersede"

Again, I must take an issue not addressed by the Court. The District Court held that the application of TIL "to disclosure forms and statements which have been submitted to and approved by the Commissioner of Insurance . . . would allow the Federal Act to supersede state regulation of this aspect of the business of insurance, and invalidate those state regulations which might be inconsistent with the Federal Act, *e. g.,* paragraphs 2, 5, and 6 of the guidelines. . . ." [30]

In attacking this holding, Perry strenuously urges that imposition of TIL requirements here would not result in a conflict between the state and federal laws. I construe this argument to mean essentially that supplementary TIL requirements can

---

**29.** A year earlier, this Court in *Battle v. Liberty National Life Ins. Co.,* 1974, 493 F.2d 39, 51 n.12, specifically declined to decide what the appropriate standard should be:

> In determining whether there is state regulation of the insurance business, the courts have adopted varying points of view. In *Ohio AFL–CIO v. Insurance Rating Board,* 451 F.2d 1178 (6th Cir., 1971), cert. den., 409 U.S. 917, 93 S.Ct. 215, 34 L.Ed.2d 180 (1972), the court stated that the requirement of state regulation under the McCarran Act is satisfied if the state has " 'generally authorized or permitted certain standards of conduct.' " *Id.* at 1182. The regulatory scheme was con-

sidered sufficient even though it may not have been enforced. In *Travelers Ins. Co. v. Blue Cross,* 481 F.2d 80 (3 Cir. 1973), the court recognized the test set forth in the insurance rating case, but then found that the state regulation was more "aggressive" and encompassing. Because we disagree with the district court for other reasons specified above, we need not determine either the standard or the extent of insurance regulation in Alabama at this time.

**30.** The guidelines are set forth in note 22, *supra.*

be imposed without invalidating, impairing, or superseding Alabama law. Apart from the fact that the same could be said about almost any law, I do not believe that "invalidate, impair, or supersede" means the mere absence of conflict. That term includes the displacement of, or the superimposition of federal requirements on, transactions that are tailored to meet state requirements. *Variable Annuities, supra,* 359 U.S. at 68, 79 S.Ct. at 620, 3 L.Ed.2d at 643.

For example, under the Alabama guidelines, ¶ 2 (note 22, *supra*), the insurance company is required to disclose "the amount of any down payment made to the agent at the time of the sale." Fidelity's form (note 2 of the Court's opinion *ante*) listed "Cash Downpayment." Perry's complaint alleged the failure to disclose in addition the "total downpayment" as required by § 226.8(c)(2) of Regulation Z.[31]

While I would concede that there would be no "conflict" in imposing § 226.8(c)(2)'s "total downpayment" disclosure rule here, I do not agree that such imposition would not invalidate, impair, or supersede the Alabama guidelines. I believe that the imposition of any additional requirements— whether conflicting or nonconflicting— would impair or supersede Alabama's laws and regulations because that supplementation would take from the State the power to regulate exactly as it sees fit. And it would in turn repeal the McCarran Act by implication in a situation where Congress has not expressed its will to do so. I would be unwilling to judicially legislate additional, nonconflicting or conflicting TIL requirements onto Alabama's present specific regulation of the sale of life insurance policies under premium financing arrangements. To do so would render McCarran meaningless and impose "barrier[s] to the regulation . . . of [the insurance] business by the several States" in direct contravention of Section 1 of the Act, 15 U.S.C.A. § 1011. If Perry believes that insurance companies who sell policies under premium financing arrangements should be subjected to the requirements of TIL, her proper resort is to Congress.

Finally, Perry argues that by enacting § 111 of TIL, 15 U.S.C.A. § 1610,[32] Congress intended an accommodation of state and federal law. While undoubtedly true, this contention completely overlooks the Congressional promise contained in McCarran that it would speak out if a federal act passed under the Commerce Clause[33] was to apply to the business of insurance. In a similar vein, Perry urges that Alabama has not taken advantage of the total exemption afforded in 15 U.S.C.A. § 1633.[34] This position also ignores the clear intendment of the McCarran Act. I agree with the Sev-

---

**31.** Perry made no payment, down- or otherwise, other than the $10 cash downpayment disclosed. Thus, even if Fidelity had "disclosed" to Perry the total downpayment, that amount would have remained $10.

**32.** § 1610. Effect on other laws—Inconsistent provisions

(a) This subchapter does not annul, alter, or affect, or exempt any creditor from complying with, the laws of any State relating to the disclosure of information in connection with credit transactions, except to the extent that those laws are inconsistent with the provisions of this subchapter or regulations thereunder, and then only to the extent of the inconsistency.

**State credit charge statutes**

(b) This subchapter does not otherwise annul, alter or affect in any manner the meaning, scope or applicability of the laws of any State, including, but not limited to, laws relating to the types, amounts or rates of charges, or any element or elements of

charges, permissible under such laws in connection with the extension or use of credit, nor does this subchapter extend the applicability of those laws to any class of persons or transactions to which they would not otherwise apply.

**33.** TIL was clearly enacted under the Commerce Clause. *Mourning v. Family Publications Service, Inc.,* 1973, 411 U.S. 356, 377, 93 S.Ct. 1652, 1665, 36 L.Ed.2d 318, 334.

**34.** § 1633. Exemption for State-regulated transactions

The Board shall by regulation exempt from the requirements of this part any class of credit transactions within any State if it determines that under the law of that State that class of transactions is subject to requirements substantially similar to those imposed under this part, and that there is adequate provision for enforcement.

enth Circuit's rejection of the same contention raised in *Lowe v. Aarco-American, Inc.,* 7 Cir., 1976, 536 F.2d 1160.[35] If Alabama chooses to enact a law similar to TIL in order to qualify for credit transaction exemptions, it can do so. It can also regulate this aspect of the business of insurance in a manner which it thinks most suitable to protect Alabama policyholders. One has nothing to do with the other.

I would emphasize one thing. I have expressed my opinion here on a very narrow question. What the result might have been if Alabama did not require form approval or if the Insurance Commissioner had not issued guidelines specifically relating to the sale of life insurance policies to college students is a case which I do not address.[36]

However, on the facts as they do exist, I would affirm the holding of the District Court that the McCarran Act does preclude application of TIL.

## APPENDIX

*Excerpts From 91 Congressional Record January 25, 1945 (Senate)*

■ At 479:

Mr. MURDOCK. I invite the Senator's attention to paragraph (b) of section 2 of the bill, reading as follows:

(b) No act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such act specifically so provides.

That part of the bill is applicable, is it not, to Federal statutes now in existence?

Mr. FERGUSON. That is the purpose of the section.

Mr. MURDOCK. It is also applicable, is it not, to any Federal statutes which may be enacted in the future?

Mr. FERGUSON. Yes; provided the statutes do not specifically relate to insurance.

Mr. MURDOCK. If the Senator will pardon me, I agree with him that the language affects only statutes the subject of which is insurance.

Mr. FERGUSON. Or specifically relating to insurance.

Mr. MURDOCK. Yes. But certainly that part of the bill to which I have referred would allow repeal by State legislatures of the Sherman Act so far as it relates to insurance unless the Congress of the United States should amend the

---

35. However, I do join the Court, *Cochran,* 606 F.2d at 465, *ante,* note 13, in rejecting the other holding of *Lowe v. Aarco-American,* 536 F.2d at 1162, that the McCarran Act applies when the transaction involves the insurance business, even if neither party is an insurance company.

36. In the few cases that have involved McCarran Act defenses to TIL claims, once the courts have found that the particular activity is part of the business of insurance and that the state has regulated that activity, they have automatically found that application of TIL would invalidate, impair, or supersede state law. In *Gerlach, supra,* the Court seemed to hold that Florida's statutory control over the fixing of insurance rates was enough to trigger McCarran. In discussing an issue not before it—premium financing—the Court found that certain sections of the Florida statute set forth what disclosures were required to be made in a premium financing agreement. The Court stated: "It is immaterial that the regulation is not the same. What is controlling is that the regulation exists." 338 F.Supp. at 650.

In *Lowe v. Aarco-American, Inc.,* 7 Cir., 1976, 536 F.2d 1160, the Court of Appeals found that the credit sale of policies by an insurance broker and a premium finance company constitutes part of the business of insurance which Illinois regulated under its Insurance Code and the Premium Financing Companies Act. Relying on *Gerlach's* dictum, the Court held that application of TIL would supersede Illinois law on the same subject, namely, disclosure.

In *Ben v. General Motors Acceptance Corp.,* D.Colo., 1974, 374 F.Supp. 1199, the plaintiff brought a TIL claim against GMAC and its insurance subsidiaries. The Court stated that Colorado has "occupied the field of regulating the activities of insurance companies in a comprehensive manner". Again following *Gerlach,* it held that because TIL does not specifically relate to the business of insurance, it does not apply when the state has exercised its right to regulate and control that business. *Ben* can thus be read to stand for the proposition that mere general legislation in the field of insurance results in barring a TIL claim.

Sherman Act so as to provide specifically either the repeal, invalidation, or impairment of such a State law.

Mr. FERGUSON. I appreciate the Senator has used the word "repeal." The bill would not go so far as to repeal the Sherman Act except as there would be a temporary repeal until the dates mentioned in the so-called moratorium section.

At 480–81:

Mr. O'MAHONEY. Does the Senator from Michigan desire that the bill, if it shall be passed by this body, shall be interpreted anywhere as an intention of Congress to permit monopoly to be established in the insurance industry?

Mr. FERGUSON. No; by no means does the bill anticipate that any act would or should be passed which would create monopoly.

Mr. O'MAHONEY. Then, does the Senator believe that the bill as it now stands permits that interpretation?

Mr. FERGUSON. It would permit it. I understood the Senator from Wyoming to be familiar with the language on page 2, which was read by the able Senator from Utah, and I think the bill is broad enough to allow a State to pass a law allowing any agreement or contract other than those inhibited in paragraph (b) of section 4. But it is not the purpose of the bill at all to foster monopoly, or to anticipate that any act will be passed permitting or even encouraging monopoly. A State law relating to taxation, a law relating to regulation, for instance, the fixing of rates, or the fixing of the terms of a contract of insurance, which might under some definitions of monopoly be monopolistic, would be permitted under the pending bill; but if the State law undertook to authorize a boycott, a coercion, or an intimidation, or an agreement to do any one of those three things, then it would be clearly void because Congress would have already spoken, and once Congress speaks on interstate commerce, no State can speak contrary to the congressional declaration.

\*　　\*　　\*　　\*　　\*　　\*

Mr. MURDOCK. The bill does not say what the Senator has indicated. What the bill says is that every act of Congress in existence now or which may be enacted in the future dealing with the question of insurance or the regulation of insurance shall not be construed—and that is pretty strong language—"to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such act specifically so provides."

So we would do what? We would say to the State legislatures, "You can pass any law you desire with reference to insurance and the regulation thereof which does not involve agreements or acts of boycott, coercion, or intimidation, unless the Congress at some future date specifically repeals or invalidates your State law."

I wonder if the Congress of the United States wants to do that.

Mr. FERGUSON. The bill does not go as far as that.

\*　　\*　　\*　　\*　　\*　　\*

Mr. MURDOCK. My understanding of what the Senate Judiciary Committee wanted to do and what I hoped it would do was that we would by the enactment of a bill of this kind call the attention of the respective States of the Union to the fact that the Supreme Court of the United States had held that the business of insurance is commerce, and knowing that certain hardships were inevitable because of past practice and procedure, it was my intention, and I thought the intention of the Committee on the Judiciary, to say to the States, "For a certain period, long enough for you to take action, you will be allowed to make adjustments of your State laws to harmonize with the decision of the Supreme Court of the United States." But under the bill we would not do that. In my opinion, we would do exactly what the Senator from Wyoming implies we would do—that is, invite the respective State legislatures to pass acts

which would permit agreements which would otherwise be in violation of the Sherman Act.

Mr. FERGUSON. Mr. President, I think an explanation of paragraph (b) of section 2 should be made at this time. The purpose of that provision is very clear, that Congress did not want at the present time to take upon itself the responsibility of interfering with the taxation of insurance or the regulation of insurance by the States. We were able to single out and to indicate that we had in mind three acts of which we wanted to make exceptions, because they did not relate to insurance. I read from the bill:

Sec. 3. Nothing contained in the act of September 26, 1914, known as the Federal Trade Commission Act, as amended, or the act of June 19, 1936, known as the Robinson-Patman Antidiscrimination Act, shall apply to the business of insurance or to acts in the conduct of that business.

Now on page 3, and we find section 5:

Sec. 5. Nothing contained in this act shall be construed to affect in any manner the application to the business of insurance of the act of July 5, 1935, as amended, known as the National Labor Relations Act, or the act of June 25, 1938, as amended, known as the Fair Labor Standards Act of 1938.

Mr. MURDOCK. Will the Senator yield?

Mr. FERGUSON. Permit me a further word of explanation.

Mr. MURDOCK. Very well.

Mr. FERGUSON. If there is on the books of the United States a legislative act which relates to interstate commerce, if the act does not specifically relate to insurance, it would not apply at the present time. Having passed the bill now before the Senate, if Congress should tomorrow pass a law relating to interstate commerce, and should not specifically apply the law to the business of insurance, it would not be an implied repeal of this bill, and this bill would not be affected, because the Congress had not, under subdivision (b), said that the new law specifically applied to insurance. I think that makes the bill very clear.

■ At 481:

Mr. RADCLIFFE. I hesitate to differ with the Senator from Utah [Mr. Murdock], but I want to call his attention to a fact which is, of course, very obvious, that the difficulties of working out the insurance readjustment following the decision of the Supreme Court are colossal. I do not believe anyone who does not come very closely in contact with the insurance business can realize that the decision by the Supreme Court to which reference has been made is one of the most far-reaching ever rendered by that Court. It means that an enormous business which, with the unqualified approval of the Federal Government, has operated for many years in a certain way, must now meet the new and fundamental conditions involved necessarily in any passage from State to Federal regulation. That does not involve merely one but a thousand-and-one different problems to be handled, many of them around the first of the present calendar year.

■ At 481–82:

Mr. RADCLIFFE. Mr. President, I called the President's attention to the gravity of the situation and asked for a moratorium. His response was favorable, as it was later in answer to my letter of December 20. Of course, no one knows what legislation any State might try to pass. It might try to pass any sort of legislation, but it is extremely unlikely that any State, knowing that at the end of several years the moratorium provided for in this bill will come to an end, would try to run amok and pass any such law as the Senator from Utah suggests.

In subsection (b) there are several purposes contemplated. The insurance commissioners and many of the insurance companies have been in very great doubt as to how they could operate at this time with respect to matters of collection of premiums, general regulations, the issuing of licenses, and many other aspects of the business. Therefore, it seems very

desirable that somewhere in this measure there should be a statement that the right of the States to regulate and to collect taxes should not be terminated or should not be repealed by implication. Otherwise, I think the States may find themselves from time to time in a very serious situation in trying to function. Unless it is clearly stated somewhere that there is not a repeal by implication, such omission is likely to throw restraint upon or put serious hindrance in the way of the States functioning properly. In giving a moratorium to a business and to State governments harassed greatly by the effect of the decision of the Supreme Court, let us not do so begrudgingly or in a halfway fashion which might prove to be gravely insufficient to meet situations which we cannot today foresee.

At 482–83:

Mr. FERGUSON. I should like to answer the question of the Senator from Maryland first. The language of section 2 answers the question:

The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

That is the insurance business. So the bill specifically provides that the State laws shall apply to taxation and regulation of insurance.

\* \* \* \* \* \*

Mr. MURDOCK. I wanted to make exactly the statement to the distinguished Senator from Maryland that the Senator from Michigan has made, and that is that nothing could be more emphatic or plainer than subsection (a) of section 2:

The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

When we go that far Congress expresses itself emphatically that the regulation of the insurance business should be under State law. But when we take the next step in subsection (b) it is an invitation, in my opinion, to do the very thing that I, and I hope the Senator from Maryland, want to prohibit.

\* \* \* \* \* \*

Mr. RADCLIFFE. I agree with the Senator from Utah that the statement in subsection (a) of section 2 is quite definite and clear. But it has seemed to those who have been working upon this bill that there was some need or at least advisability that there should not be any repeal by implication. The statement beginning on page 1 is a general statement setting forth the purposes.

Since there seems to be doubt in the minds of certain people that there might be repeal by implication or that a general statement might have some crimping effect, it would not be at all unusual if a saving clause were put in the bill. It may not be necessary, but in the spirit of caution I think it might be desirable, especially knowing the very serious problems which have been confronting the insurance companies and the various States to leave them free to meet conditions some of which cannot now be foreseen. We want the companies to understand clearly and we desire the States to realize definitely that the States can go ahead and issue permits, collect taxes, and do the various other things which are necessary to be done. For that reason I think that full and unmistakable emphasis upon that right is essential. It is unnecessary and unwise to create any doubt as to the right of the States to go ahead and function freely in handling insurance.

Mr. FERGUSON. Mr. President, I agree that it should be very clear that the States can regulate and can tax insurance in all its phases. Section 2, in my humble judgment, is a very clear provision providing for such taxation and such regulation. The language of the bill makes clear the purpose of the legislation, that the taxation problem will be taken care of, and that there will be no excuse for paying under protest or not paying at all.

\* \* \* \* \* \*

Mr. FERGUSON.

\* \* \* \* \* \*

Today the various States have laws relating to insurance. It would be a physical impossibility to examine, in a short time, all those State laws and their ramifications. One State law provides that the insurance companies may fix rates subject to the approval of the insurance commissioner. Others provide that rates may be fixed if the Commission does not repeal them.

\* \* \* \* \* \*

Mr. O'MAHONEY. Does not subsection (a) of section 2 take complete account of that fact, and grant complete protection to existing State laws?

Mr. FERGUSON. I agree that, as to existing State laws, subsection (a) of Section 2 does so provide.

Mr. O'MAHONEY. Let me read it:

The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.

That is complete.

Mr. FERGUSON. I think that is correct.

Mr. O'MAHONEY. There is no reason for misunderstanding on the part of any State official or any insurance company or any policyholder with respect to the meaning of that subsection as it applies to existing law.

Mr. FERGUSON. As it applies to existing law, that is correct. However, subsection (b) provides for something further. It provides that no Federal legislation relating to interstate commerce shall by implication repeal any existing State law unless such act of Congress specifically so provides.

Mr. O'MAHONEY. The Senator puts his finger upon the precise center of this dispute, or misunderstanding. Let me say to the Senator that, recognizing the complexity of this problem, and the desirability of maintaining State regulation and State taxation, members of the Judiciary Committee who were opposed to the proposal to grant a blanket exemption from the antitrust laws desired to go as far as was humanly possible in the direction of giving the States a clear-cut opportunity to adjust State laws in accordance with Supreme Court decisions and the antitrust laws.

It is no secret that Senate bill 12, introduced by the Senator from New Mexico [Mr. Hatch] and myself, and Senate bill 340, the bill which was reported by the committee, are modifications of a measure which was originally drafted by the legislative committee of the National Association of Insurance Commissioners. So there was an effort to work with those groups. In drafting those two bills we sought to spell out each particular law which might apply to insurance. We referred specifically to the Federal Trade Commission Act, the Robinson-Patman Act, the National Labor Relations Act, and the Fair Labor Standards Act. In other words, a good-faith attempt was made to specify every single law which had an application, or might have an application, to insurance.

Section 2(b) was drafted and written into the bill which I introduced, in the belief, not that it would be interpreted as an additional exemption from the antitrust laws, but that it would be a sort of catch-all provision to take into consideration other acts of Congress which might affect the insurance industry, but of which we did not have knowledge at the time.

■ At 483–84:

Mr. BUSHFIELD. This whole controversy arose, Mr. President, because of the custom and practice, which had grown up in this country during a period of 75 years and which had been upheld by the courts of the country, of not considering insurance to be commerce. The Supreme Court finally decided otherwise.

Subsection (b), which has been referred to in the present discussion, does not, it seems to me, relate at all to the learned remarks just made by the Senator from Wyoming.

The subsection reads in part as follows:

Sec. 2. (b) No act of Congress shall be construed to invalidate, impair, or supersede any law—

And so forth. The whole crux of the subsection is the word "construed."

The purpose of the framers of the bill, Mr. President, was to provide against a sudden adverse decision by some court in construing this Act or some State act thus throwing the business of insurance into confusion. The word "construed" is the whole crux of that particular subsection. I think to eliminate it would destroy the assurance given by the bill to the insurance business, and I would vote against eliminating it.

Mr. FERGUSON. Mr. President. I think it can fairly be stated that today absolute chaos exists in the insurance world, and it has been caused by the decision of the Supreme Court to which we have referred. The pending bill is an attempt to remove and dissipate that chaos by enacting a law by which the insurance companies will be able to abide for the time being.

As I said before, the State of North Carolina, which I am informed uses the revenue obtained from the taxation of such companies for the payment of pensions, has advised us that by February 15 of this year it will be compelled to suspend the licenses of certain insurance companies and all their agents to do business there because the companies have decided that under the present chaotic conditions they do not wish to pay the tax. They do not know whether they should or should not pay it. If subsection (b) is deleted, I am of the opinion that we shall accomplish nothing by enacting the bill; because the insurance companies will still be unable to decide what they can or cannot do, and for that reason they will abide by the provisions of the State laws, and the present chaos will continue.

\* \* \* \* \* \*

The bill does not provide for repeal of the Clayton Act or of the Sherman Act, because if an attempt were made to repeal them, before they could again become effective it would become necessary to reenact them. So the language of the bill is such as to provide that they will be in full force and effect, except there will be a moratorium for a certain period. Thus there will be no necessity for the reenactment of those laws so as to make them apply to insurance in the future, unless Congress desires to do so by specific legislation.

■ At 485–86:

Mr. REVERCOMB. Mr. President, I have listened with interest to the discussion concerning the amendment to paragraph (b) of section 2. It occurs to me that not only does the proposed act provide for a suspension of the Clayton Act and the Sherman Act, but the very purpose of it is to restore the control of the insurance business to the States. If we make the change proposed in this section and say "until January 1, 1948", then the bill in its completeness will end in 1948. The present provision is—and this was the measure reported unanimously by the Committee on the Judiciary—

No act of Congress—

Existing at this time, or passed before this, or to be passed in the future— shall be construed to invalidate, impair, or supersede any law enacted by any State \* \* \* unless such act specifically so provides.

I do not think there should be any limitation of time in the provision. We do not want the law to end on January 1, 1948. We want the business left in the control of the States, unless by enactment in the future we specifically state that we do not want something they are doing to be continued.

Therefore, I call to the attention of the able Senator from Michigan the fact that if the language suggested by him shall be written into the bill, this very section will become ineffective on January 1, 1948.

What is the danger of the language as written?

\* \* \* \* \* \*

Mr. REVERCOMB. . . .

What is the danger of the language as written, when it provides that no act of Congress shall be construed to invalidate a State law dealing with insurance unless the act of Congress specifically states that it is intended so to do? That saves the power of Congress. Why provide an automatic ending of this provision, if it is the intent of Congress today to leave to the States the conduct of the insurance business and the taxing of the insurance business, because if the States cannot control the companies, the States cannot tax them. The companies are refusing to pay taxes to the States, and that is one of the things which have brought forth this proposed law. Why provide an automatic termination upon a declaration of policy by fixing a date of termination?

\*   \*   \*   \*   \*   \*

Mr. TAFT. The Senator's suggestion might be pertinent if it were not absolutely contradicted by section 4, which provides that on June 1, 1947, the Sherman Act shall again apply to the business of insurance. If we leave that provision in the bill, the one now being discussed is inconsistent with it, because if the Sherman Act applies to the business of insurance, any State law which authorizes a rating bureau becomes invalid, or those engaged in the business are subject to Federal prosecution for complying with the State law.

Mr. REVERCOMB. The only two Federal laws mentioned are the Clayton Act and the Sherman Act, and the purpose of mentioning those specifically is to require the States so to enact legislation as not to violate those two existing laws. If any legislation is enacted in the future, whatever it may be—I cannot contemplate it today—if any law shall be enacted by the Congress on interstate commerce which could possibly affect the business of insurance and bring it within the general term "interstate commerce," it would apply. Why not let the provision stand that it shall not apply unless Congress specifically says in an act that it shall apply to the business of insurance, which we are now trying to return to the States?

\*   \*   \*   \*   \*   \*

Mr. MURDOCK. If I understand the Senator correctly, he intends by the proposed act to bring about the repeal of the Sherman Act insofar as it applies to insurance.

Mr. REVERCOMB. No, if by "repeal" is meant specific repeal of the act. What we mean to do is to say to the States, "You can regulate insurance, but you cannot provide for anything that will violate the Sherman antitrust law or the Clayton Act, after the dates fixed in the bill, namely, 1947 and 1948.

Mr. MURDOCK. If the Senator will indulge me for a moment, if that is what the Senator intends, then certainly what has been called to his attention by the distinguished Senator from Ohio is applicable. What subsection (b) does, and what I object to, is that very thing. It permits the States to repeal the Sherman Act. The Senator does not want that, nor do I. What we do want to do is to grant the States a moratorium during which they can make their State laws conform to the Supreme Court decision, and regulate insurance. But if we pass the proposed law with subsection (b) of section 2 in it, it not only refers to the existing laws of the Federal Government, but to all future laws of the Federal Government. What the Senator from Michigan proposes brings subsection (b) of section 2 in line with section 4, which follows, and grants what the distinguished Senator from West Virginia wants, if I understand him, that is, a moratorium until June 1, 1947.

Mr. REVERCOMB. As I see it, two things are proposed by this bill. Not only a moratorium with respect to the Sherman Act and the Clayton Act—and we all agree that that is its purpose—but it goes further than that, if I may say so to the able Senator, and carries out the purpose of giving power to the States of regulation of insurance and the taxing of insurance companies, so long as they do not

get into conflict with a Federal law. The section before us provides that no act of Congress shall be construed to invalidate a State law unless the act of Congress specifically states that the State law is in conflict with the Federal act and is designed to override it.

\* \* \* \* \* \*

Mr. MURDOCK. Then it is applicable, it does apply, does it not, to the Sherman Act, and also to the Clayton Act, presently, because neither one of those acts specifically repeals or impairs or invalidates any State law?

Mr. REVERCOMB. I do not agree with that conclusion, because section 4 of the bill specifically says that the Clayton Act and the Sherman Act shall again be in force on the dates mentioned.

Mr. MURDOCK. That is what the Senator from Ohio called to the Senator's attention, that there is an inconsistency in the two sections, which is clarified by the amendment offered by the Senator from Michigan.

Mr. REVERCOMB. I do not think there is an inconsistency when they are read together. One says that no act of Congress shall be construed to invalidate unless Congress specifically says that it shall invalidate. Section 4 provides specifically with respect to the Sherman Act and the Clayton Act. Subsection (b) of section 2 would apply to all other laws. Section 4(a) applies to the Sherman Act and the Clayton Act. I think the sections can be read together. But I wish to say to the Senator from Michigan that if he inserts the language "until January 1, 1948," as the time to which that section shall be in effect, he automatically terminates it at that time, and automatically terminates the control of the States over insurance.

At 486:

Mr. TAFT. What bothers me about the amendment is that it implies that the measure may invalidate fees or taxes upon such business. The Senator might add at the end of section 4 "or to be construed to invalidate, impair, or super-

sede any law enacted by any State for the purpose", and so forth, during that period. The difficulty with the Senator's amendment is that it suggests at least that these two acts, even before 1947, although they do not apply to the business, might possibly invalidate a State law. I do not want the bill to carry that implication.

Mr. FERGUSON. Would the Senator explain again just where he would insert his proposal?

Mr. TAFT. At the end of section 4, line 22 on page 2, the Senator might add this language "or to be construed to invalidate, impair, or supersede any law enacted by any State", and so forth.

Mr. FERGUSON. Does the Senator feel that the words "shall not apply" are not as broad as the words now proposed by the Senator? We would use language to the effect that the Sherman Act shall not apply; we except it in subsection (b), and then we say it shall not apply. So if it does not apply, I do not see how we can say that it would interfere with the taxation or the regulation of insurance.

Mr. TAFT. Perhaps I am unduly concerned, but I am afraid the insurance companies which are doubting the validity of the taxes imposed upon them will not be greatly soothed by subsection (b) of section 2 as proposed to be amended by the Senator, because it excepts the two laws. I think we will then have to look to section 4.

Mr. FERGUSON. We eliminate everything from subsection (b) except two laws, and then we say in section 4 that those two laws shall not apply until certain dates. I think the language now is very clear as to what we mean.

\* \* \* \* \* \*

At 487:

Mr. ELLENDER. . . .

I think the bill as reported by the Judiciary Committee is clear. I think all of us agree that the States should retain the right of regulating and taxing the insurance business within their respective borders.

**492**

At 1087:

Mr. HANCOCK * * *

Under that decision insurance, if written by a company in more than one State, is, as matter of law, interstate commerce today and will be so until another Supreme Court comes along and reverses this decision. Therefore the taxes imposed on insurance companies in many States may be regarded as burdens on interstate commerce and, therefore, unlawful. As a result, many companies are refusing to pay their insurance taxes, that is, taxes on the insurance written within the several States. Others are paying taxes under protest, because they are threatened with stockholders' suits. The officials of an insurance company may not with impunity pay unlawful taxes. They are liable personally to their stockholders if they do so. Therefore it is imperative, if we are to preserve the rights of the States to tax the insurance companies on business written within their boundaries, that we pass an act authorizing them so to do. We have attempted to accomplish that purpose by sections 1 and 2 of the committee amendment to S. 340. I am not certain that we can do it but this bill goes as far as we can in an effort to maintain the rights of the States to tax the insurance business within their respective boundaries. A vast amount of State revenue is involved, and it is a matter of extreme importance to the States that action be taken to meet an immediate emergency.

At 1089–90:

Mr. GWYNNE of Iowa. Mr. Speaker, when the Supreme Court last year decided the Southeastern Underwriters case it immediately made applicable to the business of insurance many laws that we have heretofore passed regulating interstate commerce. When we passed those acts, Congress did not have in mind insurance; as a matter of fact when Congress passed the Sherman Act it was with the distinct understanding that it did not apply to insurance, because insurance at that time was not interstate commerce, under Supreme Court decisions. The net result of the Supreme Court decision therefore was to put the Federal Government in the field of control then being exercised by the States. The methods of control exercised by the States and by the Federal Government are conflicting, and the sole purpose of this bill is to take out as much of that conflict as possible until we can determine whether Congress will regulate insurance, or whether it will permit the States to regulate it.

I believe there is no substantial difference, no difference of consequence, between the bill passed by the Senate and the bill we now have before us. I intend to take up the amendments that have been discussed here a little later. Before I do that let me say a word about H.R. 1973. It starts out with the statement that insurance shall be subject to State control. The Congress, of course, cannot delegate to the States the power to regulate insurance. What we are trying to do is to make it clear to the States and to the insurance companies that we are as far as possible removing ourselves from the field.

The second thing the bill states is that no act of Congress governing interstate commerce shall apply to insurance unless the act specifically so states.

At 1090–91:

Mr. JENNINGS. In this day of promulgation of administrative law, in this day of judicial decisions which worm in and worm out and leave everybody in doubt as to whether the snake that made the crack was going in or backing out, it is a pretty good idea to keep things on the surface mighty clear, is that right?

* * * * * *

Mr. GWYNNE of Iowa. I cannot see any reason for putting in a bill the reasons why we are writing the bill, and that is all that amounts to. We give them a moratorium. Why should we undertake to tell the States anything beyond that fact? If they want to revamp their laws during the period of moratorium, that is

up to them. Why should we express the hope that they will write other laws to conform with the notions of some Members of Congress?

Mr. ANDERSON of New Mexico. The gentleman understands the Attorney General has the duty to prosecute these people; but he says, "I shall not do it, provided you get your house in order."

Mr. GWYNNE of Iowa. The Attorney General has no business advising the States what kind of laws they should enact; neither do we.

\*　　\*　　\*　　\*　　\*　　\*

Mr. GWYNNE of Iowa. That is true. There are two limitations as far as the States are concerned when they tax insurance companies. One is the Constitution. I am afraid some of the taxing policies of some of the States will have to be revamped, because they are probably unreasonably impeding interstate commerce. We cannot do anything about that, of course. The other limitation of the right of the States to tax insurance companies would arise if Congress itself would move into the field. In this bill we are making it clear that we do not move into the field.

■ At 1092:

Mr. SPRINGER. This bill provides a moratorium. That is the important feature contained in this bill. Everyone knows that great consternation developed following the decision in the case of the United States against Southeastern Underwriters Association, et al. The States did not know what to do following that decision, and the insurance companies certainly did not know what to do. The question of taxation was involved, and the question of the control and regulation of insurance companies by the several States was also involved. At the present moment, unless this measure, or similar legislation, is passed to protect the States and protect the insurance companies with regard to their control and the question of taxation, utter confusion will result and utter chaos will reign in the several States.

My thought has been, as has been stated on the floor of the House by others, that I would far prefer to take the question of insurance entirely out of the commerce clause of the Constitution and entirely away from any Government control. But this emergency is immediate and it is necessary to pass this legislation now. The States do not know what to do with respect to the collection of taxes and the insurance companies do not know what to do with respect to the payment of taxes. The several States have no charted course with respect to the control or the regulation of insurance companies, since the case above cited, has been decided. Confusion and chaos has been brought about by that very peculiar decision.

Mr. Speaker, since this measure has been pending many insurance companies, and many State state officers, have written to me respecting that resulting confusion. It is essential that this measure be passed promptly in order to avoid confusion in the future.

This measure seeks only to establish a moratorium until January 1948 in order that the several States may continue their control and regulations over the insurance business and to proceed with the collection of taxes, in the manner and form intended by Congress. At the end of that period I hope—and I am confident a majority of the Members also hope—that this matter may be worked out in a proper manner—preserving to the several States their rights to control and regulate the insurance business within such States, and to collect the taxes now permitted—all without Government interference. I intend to support the measure.

*February 26, 1945 (Senate)*

■ At 1442:

Mr. ELLENDER. At the end of the 3-year period will the taxing and regulatory powers of the States be in anywise affected should the Congress not take any action at all?

Mr. McCARRAN. No; they will not be affected.

■ At 1443:

Mr. McCARRAN. . . .

During the 3-year moratorium the States may, if they see fit to do so, enact legislation for the purpose of regulation. If they do enact such legislation, to the extent that they regulate they will have taken the business of insurance in the respective States out from under the Sherman Anti-trust Act, the Clayton Act, and the other acts. If during the moratorium the States do not enact legislation for regulatory purposes, then on January 1, 1948 the Sherman Act, the Clayton Act, and the other acts will become immediately applicable.

■ At 1443–44:

Mr. O'MAHONEY. I believe the Senator from Michigan went a little further than was his intention when he said that if the States have legislated certain things will take place. The bill says if the States have regulated.

Mr. FERGUSON. I had reference to legislation dealing with regulation and taxes.

Mr. O'MAHONEY. The bill attempts to provide for a moratorium. I ask for the attention of the Senator from Florida in order that I may give him my interpretation of the bill.

While the Southeastern Underwriters case was pending in the Supreme Court an effort was made to deprive the court of jurisdiction by passing a bill which, in effect, provided that the Sherman and the Clayton Acts should not apply to the business of insurance in any way, shape, or form.

Mr. PEPPER. Knowing how actively the insurance companies of my State fought me because I opposed the bill, I should remember it.

Mr. O'MAHONEY. That bill was not enacted. The pending bill provides for a moratorium. It contains a declaration that for a period of time the Sherman and Clayton Acts, as well as the other acts, shall not apply.

Section 4 specifically declares that the National Labor Relations Act, the Fair Labor Standards Act, and the Merchant Marine Act shall apply. Nothing in the proposed act shall be construed to affect their application. In other words, there is a positive declaration that these three specific Federal laws which were enacted by Congress to apply to commerce apply also to insurance.

Then we have a clear recommendation of the principle of the Supreme Court decision in the Southeastern Underwriters case.

Now with respect to the section to which the Senator himself refers, it follows the declaration in the very first section that "Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest." So now we endeavor to convey that power of regulation to the States—to recognize it, I should say, rather than convey it—to recognize as desirable the regulation.

\*　　\*　　\*　　\*　　\*　　\*

Mr. PEPPER. Does that mean that the States can by their own laws defeat the applicability and operation of the Sherman Antitrust Act and the Clayton Act?

Mr. O'MAHONEY. I think the answer to that question will be clear when I point out that there are certain agreements which can normally be made in the insurance business which are in the public interest, but which might conceivably be a violation of the antitrust law, which prohibits combinations and agreements in restraint of trade.

Mr. PEPPER. Would it not be better that those agreements, if there are such that are legitimized, be identified in the statute?

Mr. O'MAHONEY. I quite agree with the Senator, and I endeavored to the very best of my ability to induce the committees of Congress to write into the law specific exemptions from the antitrust law, but I was unable to prevail in the Committee on the Judiciary and I was unable to prevail on the floor of the Senate. But now we have this declaration that with respect to these particular acts,

the Sherman Act, the Clayton Act, the Federal Trade Commission Act, no act of Congress shall be construed to invalidate the law of any State passed for the regulation or the taxing of the business of insurance, and then the proviso.

Mr. PEPPER. Will the Senator read the proviso?

Mr. O'MAHONEY. It provides that after January 1, 1948, these several acts—

Mr. PEPPER. That is, the Sherman Act and the Clayton Act.

Mr. O'MAHONEY. Yes. They "shall be applicable"—there is a positive declaration—"to the business of insurance to the extent that such business is not regulated by State law," as was stated by one of the House Members of the conference committee. I interpret that to be a clear statement that if the States do not regulate, the power of Congress to regulate is clearly enunciated. I do not conceive this to be a grant of power to the States to authorize by permissive legislation obviously adverse combinations which would be against the public interest.

Mr. PEPPER. Am I correct in saying that under the proviso which the Senator has just read, if a State made it an offense, under the laws of the State, to engage in combinations in restraint of trade, the Sherman Antitrust Act could not apply to combinations and restraints of trade by companies engaged in business in that State? Is not that what it means?

Mr. O'MAHONEY. No; I think that, for example, a rating bureau, formerly agreement among insurance companies, under the supervision and regulation of the State, would be permitted.

Mr. PEPPER. That may relate to the getting together and filing of proper data and obtaining certain statistical information and disseminating it, and all that, but the legal effect of the proviso which the Senator has just read is that a State can absolutely prevent the applicability of the Sherman Antitrust Act and the Clayton Act to insurance companies doing business in the State by passing a State act which will make combinations and restraints of trade unlawful in that State. As a practical matter, we know that the States cannot and will not enforce these laws against these insurance companies.

Mr. WHITE. Mr. President, is it not perfectly clear that the force and effect of these Federal statutes may be applicable and shall be applicable to whatever extent the State law fails to occupy the ground and engage in regulation? As I take it, there are two jurisdictions.

Mr. McCARRAN. There always are.

Mr. WHITE. There is the State, authorized to act to whatever extent seems proper.

Mr. McCARRAN. That is correct.

Mr. WHITE. Then the Federal Government can come in, and it does come in and may legislate beyond the limit of the State legislation.

Mr. McCARRAN. To the extent that the State does not regulate.

Mr. WHITE. To the extent that the State does not regulate.

Mr. MURDOCK. Mr. President, does the Senator from Maine take the position that, under the conference report it becomes necessary for the Congress to act again affirmatively, subsequent to any State action taken?

Mr. WHITE. Not at all; that is not my view of the matter at all. My view is that the State may regulate. If, however, the State goes only to the point indicated, then these Federal statutes apply throughout the whole field beyond the scope of the State's activity.

Mr. McCARRAN. That is a correct statement.

Mr. MURDOCK. Without any subsequent action on the part of Congress?

Mr. WHITE. Without any subsequent action on the part of Congress.

Mr. MURDOCK. I think that therein lies a very important feature of this whole matter. I agree thoroughly with the Senator from Maine that insofar as the States step into the picture affirmatively and act by regulation, they may do

so. As the Senator from Wyoming has said, we convey no authority, we simply recognize their right to regulate. Insofar as they fail to cover the same ground covered by the Sherman Act and the Clayton Act, those acts become effective again.

Mr. BARKLEY. Mr. President, will the Senator yield?

Mr. McCARRAN. I yield.

Mr. BARKLEY. I should like to ask, in this connection, whether, where States attempt to occupy the field—but do it inadequately—by going through the form of legislation so as to deprive the Clayton Act, the Sherman Act, and the other acts of their jurisdiction, it is the Senator's interpretation of the conference report that in a case of that kind, where the legislature fails adequately even to deal with the field it attempts to cover, these acts still would apply?

Mr. McCARRAN. That is my interpretation.

*February 27, 1945 (Senate)*

At 1478:

Mr. McCARRAN. The Senator undoubtedly recognizes the fact that the Congress of the United States would not attempt to tell a State how and upon what subject it should legislate. The Senator will agree with that statement, will he not?

Mr. PEPPER. On the contrary, Mr. President, I may say that I am not willing to leave the applicability and the effectiveness of the Sherman Act and the Clayton Act to the decision of a State legislature. By doing so the Congress would be abrogating its power with respect to the subject exclusively to the several legislatures, that is, if we pass this law without imposing any limitation upon the States in the exercise of their regulatory power that it must be not inconsistent with the Clayton Act or the Sherman Act.

Mr. McCARRAN. Under the provisions of the section in the conference report to which the Senator addresses himself, the States are advised and warned that they have a moratorium of 3 years during which they may bring themselves into compliance by way of regulation. If at the end of the 3 years they have not brought themselves into compliance, if they have not regulated the business of insurance, then they must take the consequences because after that period is over the Sherman Act and the Clayton Act and the other acts become immediately again in force as regards the business of insurance. That is all there is to that provision.

At 1480:

Mr. PEPPER: * * *

But if we say—which we do say by the language, in my humble opinion—that if they preempt this field by regulating it by State legislation, then the Federal act shall not apply; there is not anything to prosecute. There is not any juridical question that is raised. We have then given them carte blanche to legislate on anything they want to, and have said that if they regulate, then we withdraw from the field to the extent that they have covered it, and if we legitimize a rate they have fixed in practice can anybody deny that they have covered the subject, that they have regulated the field, and that they have occupied the domain? If they have, then we have by our own act provided that the Sherman Act or the Clayton Act shall not have any effect in a case of that sort.

\*   \*   \*   \*   \*   \*

A State has the right, without any legislation, to regulate anything pertaining to the insurance business, and to the extent that it regulates it has legitimized in its regulations so far as these Federal acts are concerned, and by the proposed legislation we would give them the right to go as far toward cutting down or toward emasculating the Sherman Act and the Clayton Act as they choose to go.

.   .   .   .

At 1481:

Mr. FERGUSON. Under the language which is now in the bill as it appears in

the conference report, if a State passes an act regulating insurance or taxing insurance, and that regulation is contrary to the Sherman Act or the Clayton Act, with three exceptions, then the State law would be the law. Here are the exceptions:

Nothing contained in this act shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.

In other words, under the terms of the bill, there are six things on which a State could not legislate. They are boycott, coercion, or intimidation, or agreements to boycott, coerce, or intimidate. But with respect to anything else, if the States were specifically to legislate upon a particular point, and that legislation were contrary to the Sherman Act, the Clayton Act, or the Federal Trade Commission Act, then the State law would be binding. That is exactly what we attempted to do in the bill. It is clear what we intended to do. After a conference with the House, we believed that the States should regulate insurance, and taxation on the insurance business. But we spelled out certain things on which we thought Congress should not allow the States to legislate. Those are the things which I have mentioned. As to the others, the State has full power to act by legislation—not by agreement but by legislative act. The Senator from Florida was talking about an agreement which related to many States. This bill would not permit such an agreement, because no State law could allow a monopoly to exist outside the State.

Mr. PEPPER. I thank the able Senator for his clarity and candor. Let me ask the Senator a question. Suppose the State of Florida, through its legislature, were to provide that insurance companies may belong to a rating bureau, the headquarters of which is in Atlanta, and that such rating bureau may be the instrumentality through which rates are fixed, and that those rates, when fixed, shall be **applicable within the State of Florida.**

Would the State legislature have authority to do that under the language to which I am addressing myself?

Mr. FERGUSON. This bill would permit—and I think it is fair to say that it is intended to permit—rating bureaus, because in the last session we passed a bill for the District of Columbia allowing rating. What we saw as wrong was the fixing of rates without statutory authority in the States; but we believe that State rights should permit a State to say that it believes in a rating bureau. I think the insurance companies have convinced many members of the legislature that we cannot have open competition in fixing rates on insurance. If we do, we shall have chaos. There will be failures, and failures always follow losses.

The sale of insurance is not the same as the sale of an article in a store. When one buys an article in a store, he brings it home with him. In the case of insurance, he buys a promise to pay upon the happening of a certain event, and that event may be the burning of his home. If the company is not sound and solvent at the time the house burns, or at the time claim is made, there is no insurance at all. That is what we have tried to avoid.

Mr. PEPPER. In other words, the Senator believes in a form of rate fixing?

Mr. FERGUSON. Yes. There is no doubt that the bill allows it; but we believe that all the wisdom is not here in Congress. We believe that there is some wisdom left in the legislatures of the various States, and that they should exercise their judgment and regulate insurance, except in the respects which we have enumerated.

At 1483:

Mr. O'MAHONEY. Mr. President, there is not a line or sentence in the proposed act, as I have read it, which would delegate to any State the power to legislate in the field of interstate and foreign commerce. State regulation must be for the State and not for the United States. The bill does not sacrifice **the power of Congress to regulate in the**

field of interstate commerce, but, wisely, it seems to me, undertakes to say in effect to the State, "For this period take the responsibility and regulate insurance in the interest of the public."

At 1486–87:

Mr. BARKLEY. What I am anxious about is to know that I, as a Senator, will not be estopped in the future from voting upon any legislation regulating insurance, which has been declared to be interstate commerce, and which I have always believed to be interstate commerce. If I vote for this conference report, I am not estopped, as a Senator, from voting for any law which may be under consideration hereafter by Congress dealing with insurance, to the extent that any State authority does not touch the subject, or, if it touches it, does not deal adequately with it.

Mr. O'MAHONEY. In response to the Senator's question, let me say that one of the House conferees, in the course of the conference, used this sentence, which I thought was extremely apt: "This is a bill to authorize the States to regulate the insurance business; and if the States do not regulate it, the Federal Government can."

At 1487:

Mr. FERGUSON. I think it should be added in reply to the Senator from Kentucky [Mr. Barkley] that there is no attempt here to have Congress throttled in the future in acting upon insurance legislation. Subsection (b) of section 2 provides that if Congress does act, the act shall specifically relate to the business of insurance.

Mr. O'MAHONEY. That is correct.

Mr. FERGUSON. What we have in mind is that the insurance business, being interstate commerce, if we merely enact a law relating to interstate commerce, or if there is a law now on the statute books relating in some way to interstate commerce, it would not apply to insurance. We wanted to be sure that the Congress, in its wisdom, would act specifically with reference to insurance in enacting the law.

Mr. O'MAHONEY. In other words, no existing law and no future law should, by mere implication, be applied to the business of insurance.

Mr. FERGUSON. That is correct.

Mr. O'MAHONEY. That was the understanding.

Mr. FERGUSON. In other words, we would not repeal this law by implication.

At 1487–88:

Mr. BARKLEY. * * *

I have been somewhat disturbed by the provision in subsection (b) of section 2 of the conference report. However, I think that under the interpretation given it by the conferees my doubts have been resolved, and I intend to vote for approval of the conference report. But I wish it to be understood that in voting for approval of the conference report I am accepting the interpretation placed upon it by the conferees, namely, that if any State, through its legislature, undertakes to go through the form of regulation merely in order to put insurance companies within that State on an island of safety from congressional regulation, that effort will be futile, and not only can Congress deal with any phase of the insurance business not dealt with by a State legislature, but even in a case in which a State legislature deals with any phase of it, but does not deal with it adequately in the opinion of Congress, Congress is not in any way barred by the conference report from dealing with that subject and with the phase of it which Congress deems to have been inadequately dealt with by the State; so that hereafter we can enact such legislation as we may deem proper and wise to have enacted in connection with the regulation of this business, which clearly is interstate commerce.

At 1488:

Mr. RADCLIFFE. If we do not enact any legislation at this time, the situation will be a very serious one. The State insurance commissioners do not know what to do. For instance, they do not

know whether they can collect taxes or issue permits. The insurance companies do not know whether they can pay taxes. The insurance commissioners do not know whether they can issue regulations. The entire operation of the insurance business is now in more or less a chaotic condition due to uncertainties which require immediate legislative action. We must have some legislation at the earliest possible moment.